608

**LUZIER'S, Inc., v. NEE, Commissioner of Internal Revenue.**

**No. 9803.**

District Court, W. D. Missouri, W. D.

May 22, 1938.

Gage, Hillix, Hodges & Cowherd, of Kansas City, Mo., for plaintiff.

Maurice M. Milligan, U. S. Dist. Atty., and Sam C. Blair, Asst. Dist. Atty., both of Kansas City, Mo., for defendant.

REEVES, District Judge.

This is a suit to recover for an alleged overpayment of excise taxes. The tax was assessed by the Commissioner of Internal Revenue under the provisions of Section 603 of the Revenue Act of 1932, 26 U.S.C. A. § 1420 et seq., relating to the special subject of Tax on Toilet Preparations. The amount of the tax fixed by said Section is "a tax equivalent to 10 per centum of the price for which so sold."

The plaintiff admittedly is engaged in the manufacture and sale of toilet preparations and was so engaged prior to June, 1932 and continuously thereafter. Its place of business is 3216 Gillham Plaza, Kansas City, Missouri.

The petition is in five counts and covers different periods from the month of June, 1932, to February, 1936, both inclusive. During that period, at different times, the Commissioner made assessment of taxes upon plaintiff's sales according to his determination of à fair market price, and these were paid promptly by plaintiff. During the same period the plaintiff had regularly made its return and had paid a tax in accordance with what it conceived to be a proper computation. The sales price upon which the plaintiff computed and paid its excise tax was much less than that determined by the Commissioner in his computation. It was the tax computed on the difference between the sales price believed to be proper by the plaintiff and that determined by the Commissioner, which constitutes the subject matter of this suit. The amount sued for is in an aggregate sum of approximately $150,000, including interest.

The plaintiff's records indicate that it is engaged in selling its products at retail. It contends, however, that this is not the actual fact, but that it disposes of its manufactured preparations to independent contractors, who, in turn, deal with or sell to the public.

If plaintiff be correct in its contention, then there is support for its method of computation, and, if it should further appear that the plaintiff has not passed the extra tax on to the consumer, then its right to recover would be unquestioned.

On the other hand, if the plaintiff as a manufacturer is in fact engaged in selling its product at retail, then, upon the record, the assessment made by the Commissioner upon his determination as to what constitutes a fair market price would prevail

as not arbitrary and the plaintiff would not be entitled to recover.

The plaintiff distributes its products widely throughout the United States. Its method of doing business is to grant to, or enter into territorial contracts with, individuals. Each such contract is designated as "Territory Contract."

The plaintiff is described in such contract as "first party", and the other contracting party is described as "second party". Such contract stipulates that: "First party hereby gives and grants to second party the right to demonstrate, sell and further the sale of all of the products of first party for a period of ——— years from date hereof within the following described territory, to-wit."

It then specifies that: "* * * Second party agrees to devote his (her) entire time and energy to the business of demonstrating, selling and furthering the sale of products manufactured or produced by the first party, within the limits of the above described territory or district. Second party shall diligently and faithfully canvass said territory in person or by or through qualified subcontractors, representatives or assistants whom he (she) may select, subject, however, to the approval of first party."

The subcontracts mentioned must be approved by the plaintiff and subcontractors are subject to be discharged by second party upon plaintiff's order. Plaintiff fixes the retail price at which its products shall be sold. Plaintiff requires that sales within the territory shall aggregate a certain minimum, and failure to produce such a minimum would be grounds for a cancellation of the contract.

Compensation to the second party is upon a commission basis, that is to say, a certain "percentum on all such sales, but not including the ten per cent service charge." It is within the right of plaintiff to pay the accrued compensation to the subcontractor. All sales are to be made for cash. Material for demonstration purposes shall be furnished at a discount of 60% plus the 10% service charge. Printed matter for advertising purposes is furnished the second party without charge, save only in the case of special items. The plaintiff shall not become liable for any obligations of the second party, but the second party shall not only devote all of his or her time to the sale of plaintiff's manufactured products, but must confine his or her efforts to the sale of plaintiff's products only.

It is also provided in said contract that the second party shall hold plaintiff harmless in all of the transactions of said second party. This is also the requirement with respect to all second parties and subcontractors; "it being expressly agreed that second party occupies at all times the position of an independent contractor and controls all ways and means relating to the proper performance and completion of this contract, first party looking to second party to obtain the desired results as herein set out."

The commission allowance to the second party for the sale of plaintiff's merchandise is 60% of a designated and fixed and listed retail price, plus 10% as a service charge. A formula for a ready understanding of the meaning of such contract would be that on a sale at a fixed and listed retail price of $10, the second party would be entitled to a commission of $6 on that amount. However, a 10% service charge on the $10 should be added to determine the actual sale price, which would be $11. From this amount second party's commission would be deducted and the balance of $5 remitted to the plaintiff. The meaning of this computation is that the second party under his contract would be entitled to a commission equal to 60% of the listed retail price.

The holders of territorial contracts, according to the testimony, employed or contracted with canvassers, whose function it was to make a house to house canvass to obtain orders. According to the practice, each purchaser of plaintiff's product by this method of selling became a patron and customer to the extent that the name of such purchaser was stamped on the packages containing the preparation purchased by such customer.

The canvassers were provided with sales blank pads, and when an order was obtained the original was sent to plaintiff by the canvasser and a copy thereof was delivered to the second party or general contractor. The cash remitted by the canvasser, together with the commission, was credited to the second party or territorial contractor.

The plaintiff either shipped its merchandise to fill a sale order upon a cash remittance from the canvasser, or it sent such merchandise c. o. d. to its customer. The canvasser was authorized apparently to deduct commission contracted between

such canvasser and the territorial agent. The plaintiff had nothing to do with that. It merely credited 60%, as hereinbefore suggested, on the retail list price of its merchandise to the account of its territorial contractor.

There was evidence on behalf of the plaintiff that its manufacturing cost of products of this character range from 15 to 20 per cent. of the usual list price. It computed its selling price at approximately 31% of the retail list price. Many manufacturers and others support plaintiff's theory as to the cost of manufacture and the usual wholesale price received by manufacturers for similar products. On the other hand, the government, in accordance with its contention, proved by numerous witnesses that the manufacturer's price was ordinarily 60% of the listed retail price.

It will be observed, therefore, that the main issue in the case is whether the excise tax in question was correctly computed by plaintiff and paid on the basis of 31% of the retail price, or whether the actual selling price of the plaintiff as a manufacturer was 60% of the listed retail price as determined by the Commissioner. These will be considered:

1. While the courts must indulge a presumption of accuracy in the determination made by the Commissioner, yet this presumption will take flight in the light of the facts in evidence. If the plaintiff has carried its burden of proof by showing facts which demonstrate that the tax resulted from an arbitrary act on the part of the Commissioner, it would be entitled to recover. And moreover, it is the duty of the court, as contended by plaintiff, to interpret any doubtful provisions, whether in the statute or regulations, most strongly in favor of the taxpayer and against the government.

If, therefore, the Commissioner's determination of a fair price is arbitrarily excessive, it should be rejected and the plaintiff should be given judgment for the amount of the tax, even though a correct amount has not been proved.

With these postulates in mind, the facts may be examined in the light of the letter of the law and the decisions.

2. Said Section 603 fixes the amount of the tax as "10 per centum of the price for which so sold."

Section 619 of the Revenue Act of 1932, 26 U.S.C.A. § 1420 et seq., very properly undertakes to define or elucidate the meaning of "market price". Quite clearly the manufacturer's sales price includes "any charge for coverings and containers of whatever nature, and any charge incident to placing the article in condition packed ready for shipment." This means that the mere cost of manufacture, as testified by some of the witnesses, would in many cases (and apparently most emphatically in this case) be supplemented with the expense of coverings and containers. It was in evidence that the plaintiff specially packaged its merchandise for each individual customer and caused the name of the customer to be stamped on such packages or containers.

The statute further provides that transportation, delivery, insurance, installation, or other charge shall be excluded from the price "only if the amount thereof is established to the satisfaction of the Commissioner, in accordance with the regulations."

Whether such items were established to the satisfaction of the Commissioner, so as to secure their exclusion from the price upon which the tax was to be computed does not appear from the testimony; or, at least it is not now recalled.

In case of retail sales: In case the manufacturer sells at retail, then it is provided by said Section 619 that the Commissioner shall compute the tax "on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof", and that this price is to be "determined by the Commissioner."

If, therefore, the plaintiff sells its products at retail, then the Commissioner was well supported by the evidence as to the price for which articles are sold "in the ordinary course of trade" by manufacturers or producers thereof. The usual price received by manufacturers and producers was upon a discount of 33⅓ and 10 per cent., which means that the net discount was approximately 40%. This naturally poses the question as to whether the plaintiff sold its products at retail.

3. According to the undisputed testimony the plaintiff shipped its merchandise directly to the ultimate consumer. It only received orders from the territorial contractors or from their subcontractors. Such orders were purchase orders, executed by the customer. The goods were then packaged when the order was filled and

shipment was made directly to the customer. The title to the merchandise passed from plaintiff to such customers. At no time did the territorial contractor or his subcontractor ever take title to any of the merchandise sold by plaintiff, save only as to the material used solely for demonstration purposes. Such material was sold to the contractors at a heavy discount, and it may be inferred from the record that such persons were permitted to dispose of such material at the regular listed retail prices. This constituted a small percentage of plaintiff's sales, and its whole purpose was for demonstration purposes and should not be characterized as a sale for general consumption and use. It could not be treated or accepted as a standard for determining the fair market price of plaintiff's merchandise. It was in the nature of advertising and was designed to facilitate and increase trade with the plaintiff and for its product.

While the territorial contractors were considered independent contractors in a clause of the territorial contracts, yet nevertheless the entire object and purpose of that clause was to relieve the plaintiff of any liability that might be created by the acts of the several contractors as its agents.

For instance, there is an explanatory phrase after the use of the words "independent contractor" as follows: "and controls all ways and means relating to the proper performance and completion of this contract, first party looking to second party to obtain the desired results as herein set out." The result sought by the plaintiff was the sale of a fixed minimum of its product, and it did not propose to have created for it or against it liabilities by the contractors and subcontractors because of the "ways and means" employed by the several contractors in obtaining the results set out.

The books of the plaintiff, according to its auditor, were so kept in plaintiff's dealings with its contractors as to indicate that it was selling its merchandise at retail.

The authorities, under a somewhat analogous state of facts, are helpful and may be consulted.

In Bourjois, Inc., v. McGowan, 85 F.2d 510, the Circuit Court of Appeals, Second Circuit, upheld the price determination made by the Commissioner, where the sales operations for the manufacturer were carried on by two subsidiary corporations.

The merchandise was sold by the manufacturer to the sales corporations, and the actual title passed to the sales corporations. However, the sales corporations had the benefit (in their transactions) of the good will and the trademark of the manufacturer. The court said [page 512]: "So the sales to the sales corporations were not only not arm's length transactions, as all now agree, but were justifiably found to be 'at less than the fair market price.'"

In the instant case plaintiff never sold its merchandise to its territorial contractors. They merely undertook to obtain purchasers for plaintiff's product, and, in canvassing the public, secured orders therefor. The trade name of the plaintiff was used, as in the Bourjois case. The "fair market price" of plaintiff's product was greater than the net received by it after deducting the commission of its territorial contractors.

In the case of Inecto, Inc., v. Higgins, D. C., 21 F.Supp. 418, the manufacturer sold its product initially to subsidiary or affiliated corporations. The title passed from the manufacturer to the subsidiaries or affiliates. The price, however, at which the manufactured product was sold to the affiliates did not control the Commissioner. He looked beyond the method employed in distributing the product from the manufacturer to the public, and the court supported the Commissioner by holding that the record and prices obtained by the taxpayer on sales direct to the public established the fair market price. It was not the object of the statute to permit a deduction of the selling cost from the fair market price.

Counsel for the plaintiff calls attention to the Congressional Record of March 10, 1932, wherein an inquiry was made as follows: "'Does the manufacturer's price that is contemplated include salesmen's commissions?'" An answer was returned as follows: "'The selling cost is not intended to be added. Now we are considering things like that, and there will be other cases that will present themselves. Some committee amendments may be necessary.'" It does not appear that the amendments as suggested by the inquiry and the answer were ever made. The act itself specifies what shall be included and what shall not be included in "fair market price." Commission of salesmen was not excluded from the fair market price.

5. In view of the above it is hardly necessary to discuss the question as to whether or not the plaintiff collected the amount of tax from its customers. Immediately upon the passage of the Revenue Act of 1932 the plaintiff abandoned a service charge of 15 cents per order, and in lieu thereof substituted a service charge of 10% on its sales at list price. This amount is far in excess of the tax imposed by the government and computed by the Commissioner. The evidence shows that this change was designed to cover other expenses than that of the tax. It was approximately adequate for all the purposes as specified in the reasons given for its being placed.

However, from the evidence in the case, it cannot be discerned that it was not passed on to plaintiff's customers, although plaintiff urges the tax sued for was paid many years after the sales were made. That is conceded, but, nevertheless, when the 10% tax was imposed by the Congress on the fair market price of plaintiff's product, the plaintiff immediately added a 10% charge, the object of which was to cover, in part at least, the new tax. If that were true, then of course it was passed on to the customer, even though the plaintiff did not pay it over to the government until a much later date, and even though it was absorbed by increased cost of production.

In view of the above, plaintiff is not entitled to recover, and judgment should be given for the defendant. It is so ordered.