## CAMPANA CORPORATION v. HARRISON.
### No. 7123.

Circuit Court of Appeals, Seventh Circuit.
Aug. 14, 1940.

401

William J. Campbell, U. S. Atty., of Chicago, Ill., for appellant.

George I. Haight, of Chicago, Ill., for appellee.

Before MAJOR, TREANOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This is an action brought against the revenue collector for the United States to

recover additional manufacturer's excise taxes paid under protest. The plaintiff filed its Manufacturer's excise tax return under the law and paid the tax. Revenue Act of 1932, 47 Stat. 259, ch. 209, Secs. 601, et seq., 26 U.S.C.A. Int.Rev.Acts, page 603 et seq. Then the Commissioner of Internal Revenue assessed an additional tax and this tax the taxpayer paid under protest. Timely application for a refund of the additional amount paid was made and denied. Thereupon the taxpayer sued in the District Court and the Court (sitting without a jury) found for the taxpayer. The defendant Collector appealed to this Court seeking a reversal of the judgment.

Campana Corporation is engaged in the manufacture and sale of a toilet preparation or cosmetic known as "Campana's Italian Balm," with its principal place of business at Batavia, Illinois. Since the date of the taxing statute (June 21, 1932) this face and hand lotion has been subject to a manufacturer's excise tax equivalent in amount to 10% of "The price for which so sold." Section 603 of the Revenue Act of 1932. The statute requires monthly tax returns and payments, and in the instant case the tax month in controversy is July, 1933.

Campana Corporation was organized in 1926 and prior to July 1, 1933 was engaged both in the manufacture and the distribution (including advertising and sales promotion) of "Campana's Italian Balm." On July 1, 1933, a contract for the exclusive distribution and sale of Campana's Italian Balm went into effect. By this sales contract the Campana Corporation agreed to sell its product exclusively to E. M. Oswalt (60% stockholder of Campana Corporation) or his corporate transferee. As sales price for the product Oswalt agreed to pay an amount equal to the cost of production of the article plus 39% of this cost. Then Oswalt organized the Campana Sales Company and on July 1, 1933 transferred the sales contract to it.[1]

[1] The sales contract was dated June 9, 1933. At that time Oswalt was still president of the Campana Corporation. On July 1, 1933 Oswalt resigned that office and became president of the Campana Sales Company. On that day the Campana Corporation also formally authorized or ratified the sales contract. In any event the contract was operative as of July 1, 1933.

Campana Corporation was owned by five persons, and while the holdings were not identical (unless husband and wife are considered as a unit) the same five persons owned all the stock in Campana Sales Company. As to the husband and wife situation, the testimony indicates that Mrs. Oswalt purchased her stock with her own money. The testimony also shows that Mr. Oswalt was the controlling force in the sales promotion and distribution of the Campana Sales Company. Mr. Oswalt was also the pioneer (of the five) in the hand lotion field and the original sole purchaser of the trade-mark "Campana's Italian Balm" (purchased from a Canadian firm). In addition the officers of the two corporations are the same, except for the president.

Some of the invoices used during July 1933, while issued in the name of Campana Sales Company, bore the printed notation, "make remittances payable Campana Corporation, Batavia, Illinois." These invoices were received in evidence without objection and the particular notation (printed in small letters at the bottom of the invoice) escaped notice of both counsel until the argument stage. At that time counsel for taxpayer explained that the notation was printed in error on a few invoices issued from the Pacific Coast and that this had been subsequently corrected. This explanation was satisfactory to the District Court and apparently also to counsel for the Collector at the time. Obviously the invoices were introduced as typical of all invoices used in July and in particular regard to prices in that month.

The stock ownership of the two corporations as of July 1, 1933 was as follows:

|  | Campana Corporation | Campana Sales Company |
|---|---|---|
| E. M. Oswalt | 60% | 45% |
| Mrs. Oswalt | 10% | 25% |
| R. H. Brandon | 20% | 15% |
| Mrs. Brandon | 3.33⅓% | 8.33⅓% |
| Maisie Seymour | 6.66⅔% | 6.66⅔% |

The officers and directors of Campana Corporation as of July 1, 1933 were as follows:

|  | Officers | Directors |
|---|---|---|
| President | R. H. Brandon | R. H. Brandon |
| Vice-President | R. G. Sappenfield | R. G. Sappenfield |
| Vice-President | I. W. Crull | I. W. Crull |
|  |  | Mrs. Oswalt |
| Treasurer | R. G. Sappenfield |  |
| Secretary | I. W. Crull |  |

(Prior to July 1, 1933 E. M. Oswalt was president and director; on July 1, he was replaced by R. H. Brandon, not active in the business.)

Thereafter the Campana Corporation confined its activity solely to manufacturing and the Campana Sales Company assumed the risks of distribution, including advertising and sales promotion. The manufacturing corporation retained all of its tangible assets and its trade-marks and copyrights. The selling corporation soon increased its sales force from 10 salesmen (who formerly had worked for the manufacturing corporation) to 55 salesmen, and by the end of the year had become "the largest advertiser in the hand lotion field."

These corporations now maintain separate office space, and separate payrolls. Prior to July 1, 1933, the Campana Corporation made and packaged its product and stored it in the same building, and from there sold it to purchasers. After July 1, 1933, it still made and packaged its product there but deposited it ready for shipment on the shipping platform. Then the selling corporation (its vendee which also maintains offices in the same building) drives its trucks to the shipping platform and from there hauls the prepared lotion to its own warehouse located in another building. In this building the manufactured stock is stored pending delivery orders and from this warehouse shipments are made by the Campana Sales Company to its purchasers.

From 1926 to 1930 the Campana Corporation was operated on a losing basis, sustaining an annual average operating loss of around $31,000. During this period the sales area was confined to several states and the advertising outlay totaled around $300,000. Then in November of 1930 it turned to the radio as a means of reaching the public and enlarging its sales area. Thereafter came the three successful years prior to July 1, 1933, during which time it made an average annual operating profit of around $64,000; $28,000 in 1930–31; $129,000 in 1931–1932; and $35,000 in 1932–1933. Campana Corporation was the first "to take to radio" in the highly competitive field of cosmetics and toilet preparations, but its competitors were not slow to follow. Once started the radio advertising race was on, and by 1933 Campana Corporation found itself in a position where extensive use of the radio was inevitable. Already during the three years prior to July 1, 1933, its advertising outlay had mounted from $300,000 (for the period from 1926–1930) to around $1,000,000 (for the period from 1930–1933), and of this latter figure over $600,000 was chargeable to radio advertising.

This form of sales promotion (radio advertising) carried with it long term commitments, uncertain results, threats of copyright infringement and invasion of the right of privacy. For instance, Campana Sales Company after July 1, 1933 sponsored a dramatic "Variety Fair" radio program which involved one year contractual commitments with the acting profession and the radio networks but which failed after nine weeks on the air. It is easy to see that large scale or national sales promotion, to a considerable extent based on radio advertising, was hazardous and risky in this competitive field and did amount in fact to a gamble which might produce huge earnings or incur disastrous losses.

This chance element led naturally to the course of conduct questioned by the Collector in this case. Shortly before July 1, 1933, the Campana Corporation decided to confine its activity to the manufacture and sale of its product to an exclusive corporate distributor—the Campana Sales Company. The manufacturing corporation continued to retain its tangible assets and its trade-marks and copyrights. Thereafter the manufacturing corporation was free of the business hazards inherent in nationwide advertising here described, risks which were assumed by the selling corporation. For the four years since July 1, 1933 the Campana Corporation has earned an average sum of around $133,000 per year, as compared with its average profit of around $64,000 per year during the three successful years period prior thereto.

In any event, starting in July 1, 1933 and continuing every year thereafter the Sales Company's advertising and sales promotion accounted for an *annual* expenditure of around $1,000,000 (equivalent to the advertising outlay for the entire period between 1930 and 1933), chargeable in the main to radio and magazine advertising on a nationwide basis. The record discloses too that selling to an exclusive distributor was the common mode of business operation in this highly competitive toilet preparations field.

In the highly competitive toilet goods

The officers and directors of Campana Sales Company as of July 1, 1933 were as follows: E. M. Oswalt was president otherwise the officers were the same as above; the directors were E. M. Oswalt, Mrs. Oswalt and I. W. Crull.

field there are many lotions bearing advertised brands and private brands, the former commanding·about 60% of the market and the latter controlling about 40% of the market. Campana's Italian Balm is a nationally advertised brand and competes against the other advertised and private brands. Plainly these advertised brands have great value and this value is maintained by vigorous advertising. In the instant case it is to be noted that while the Campana Corporation continued to own the trade-mark "Italian Balm," much of the intangible value inherent in that trade-mark was due to the greatly increased advertising outlay of the Campana Sales Company.

Taxpayer introduced three witnesses who possessed wide experience in the manufacture and sale of toilet goods. These men testified that a sale of toilet goods by a manufacturer to an exclusive distributor was a sale in the ordinary course of trade and that the distributor is the manufacturer's "trade." These witnesses also stated that a "sale to the trade" may be consummated in any of the following transactions: (1) The manufacturer may sell to its exclusive distributor; (2) the distributor may sell to a wholesaler; and (3) the wholesaler may sell to a retailer. Oswalt also testified to the same effect and in addition stated that the common sales method in the toilet goods field was a sale by the manufacturer to its exclusive distributor.

According to the inter-incorporation sales contract the Campana Sales Company agreed to pay an amount equal to the cost of producing the article plus 39% of this cost. Using the same volume of business as over the three preceding years, the profit accruing to the Campana Corporation under this sales contract would equal an annual amount of $77,000. This is significant in view of the fact that Campana Corporation's profit in the year preceding the sales contract was only $35,000. In this connection the hypothetical question based on all the evidence in the case was presented to the three witnesses referred to above. These witnesses testified that in their opinion the contract price of cost plus 39% was a fair manufacturer's market price. These witnesses proceeded on the theory that a fair manufacturer's market price in the toilet goods field was an amount equal to the cost of production plus a reasonable return upon the value of the properties devoted to production. One in particular stated that excluding the intangible assets of the business such as the value of the trade-name, a fair manufacturer's market price of Italian Balm lotion would approximate the cost of production plus 12% of cost of production; but that considering the value of the Italian Balm label and other intangible elements of value, the contract price of cost plus 39% was a "very fair market price."

The Campana Sales Company plays an important economic part in the evidence picture of this case. This important economic function was performed formerly by the manufacturing corporation but on a much smaller scale. To the selling corporation is assigned the vast nationwide process of distribution or marketing by which Campana's Italian Balm, manufactured and ready for consumption, is advertised and sold in the channels of trade. This distribution mechanism actually brings the manufacturer and the consumer together and during the process the selling corporation in effect sells the Italian Balm lotion three times—once to the wholesalers, once to the retail dealers, and once to the consumers.

At the beginning the selling corporation prepares magazine and radio literature and other sales promotional plans. Then the task of selling to the wholesalers and to the retail outlets (in behalf of the wholesalers) commences. The selling corporation supplies the wholesalers with Italian Balm, in turn the wholesalers supply approximately 60,000 drug stores, small department stores and general stores, and in turn these retail outlets supply· the consuming public. There is only one exception to this distribution system: the selling corporation supplies the syndicate stores and large chain· operators directly, which in turn supply the public.

The selling corporation sends out its salesmen and they visit wholesalers with the view to taking orders for the hand and face lotion. The selling point used is that the Campana Sales Company will "sell what the wholesaler buys." As soon as these orders are obtained these salesmen visit the retail outlets, mail circulars to them and inform them generally as to prices, discounts and sales promotional plans. Often the wholesalers' own salesmen are used to visit the retail outlets and to obtain orders from these sources. When this occurs, the selling corporation reimburses the wholesalers for expenses and commissions on sales made by their own salesmen.

Orders from retail dealers are sent to the selling corporation which then mails these to the district wholesaler in the retail dealer's district, at the same time crediting the quantity ordered by the dealer against the stock purchased by the wholesaler.

It is in this way that Campana Sales Company sells Campana's Italian Balm three times over. We observe at once that this process of distribution is as separate and as important as the manufacturing process itself. In fact, the record stands undisputed that in the cosmetics or toilet preparations industry, radio advertising and similar advertising and selling expenses are known as "selling and advertising costs" and are not manufacturing costs. The cost of this nation-wide process of marketing is high and covers (1) the expenses incurred in selling to the wholesalers, (2) the expenses attached to selling to the retail outlets, and (3) the expenses relative to the radio, magazine and other sales promotional plans necessary to create public demand for the manufactured article. The cost for the month of July of 1933, the first month of the fiscal year 1933-1934, was around $30,000 and of this around 60% was devoted to radio advertising. This cost for the fiscal year 1933-1934 amounted to around $700,000 and since that time the annual costs have maintained themselves at a figure between $900,000 and $1,000,-000.

These then are the facts and, using the dime size of Italian Balm lotion as an example, these facts in essence present the following situation to us. Prior to July 1, 1933, the Campana Corporation manufactured its dime size lotion and then distributed it to the trade, selling in the first instance to wholesalers at approximately 5 cents (.0525) per article. This sales price reflected cost of goods sold (32%), cost of sales (57%), and profit (11%). This profit represented a return of around 33% of the cost of production (cost of goods sold). After July 1, 1933 the Campana Corporation manufactured its dime size lotion and then sold it exclusively to the Sales Company at approximately 2 cents (.0229), and in turn the Sales Company sold this article to the wholesalers at approximately 5 cents. The manufacturing corporation price reflected cost of goods sold (70%), cost of sales (7%), and profit (23%). This profit represented a return of around 40% of the cost of production. The selling corporation price reflected cost of goods sold (33%), cost of goods (51%), and profit (16%).

*Finding.* Campana Corporation filed its manufacturer's excise tax return for the month of July, 1933, showing its total sales at $14,652.70, paying the Collector a tax of $1,465.27 thereon. Thereafter the Commissioner assessed an additional tax amounting to $3,121.72 on the theory that the manufacturer's excise tax should be measured not by its own sales prices but by the sales prices of the Compana Sales Company.

The statute does not authorize the Commissioner to measure the tax by a price other than the manufacturer's sales price unless it (the manufacturer) sells at less than the fair market price and otherwise than through an arm's length transaction. Nor does it confer upon the manufacturer a right to refund if it has not borne the burden of the illegal tax. Accordingly the taxpayer's refund complaint alleges, and the Collector's answer denies, the following propositions: (1) The additional tax assessment was unauthorized and hence illegal, because Campana Corporation's sales prices were fair market prices and the inter-corporation sales were arm's length transactions; and (2) the burden of the additional tax was not passed on.

At the trial evidence was adduced to prove the above disputed propositions. This evidence consisted of oral testimony and documentary material and upon such evidence the District Court made its findings of fact. Now counsel for the taxpayer informs us that these findings are binding on appeal unless clearly erroneous. Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. On the other hand counsel for the Collector argues that these findings are not binding on appeal because they are "legal conclusions" or at most "ultimate facts" or the "issues in the case."

█ In the application of Federal Rule 52 it is the following principle that guides this Court: the reviewing court does not review the evidence as an original fact finding tribunal; it does not attempt to settle conflicts in evidence or to determine questions of credibility. In re Duvall, 7 Cir., 103 F.2d 653, 655; Guilford Const. Co. v. Biggs, 4 Cir., 102 F.2d 46, 47. Of course Federal Rule 52 does not require us to accept fact findings unsupported by the evidence. Nor does this Rule require us to respect conclusions of law which do not rest properly on the facts so found. It is

certain that the principle giving the above described weight to the trial court's findings of fact, does not compel the reviewing court to give any specific weight to the trial court's conclusions of law, as it yet remains the duty of the appellate court to decide whether the correct rule of law has been applied to the facts found. Whether special findings are supported by the evidence or whether they give the requisite support to conclusions rendered thereon, are questions open to consideration here.

In this connection counsel for the Collector points to three cases. United States v. Pugh, 99 U.S. 265, 270, 271, 25 L.Ed. 322; United States v. Jefferson Electric Mfg. Co., 291 U.S. 386, 406-410, 54 S.Ct. 443, 78 L.Ed. 859 and Nelson Co. v. Commissioner, 7 Cir., 75 F.2d 696, 697, 698. We have considered these cases and find them consistent with the principles stated. In essence he contends that "the questions in this case turn, not upon the credibility or the weight of the evidence but rather upon the legal significance to be given to the facts." In effect this contention is equivalent to stating that the evidence does not establish the propositions alleged in the complaint. We shall bear this contention in mind as we subject the District Court's findings as to (1) tax incidence, (2) arm's length transaction, (3) tax basis, and (4) selling and advertising costs, to the analysis suggested in the preceding paragraph.

*Tax Incidence.* The Statute provides for a refund of an unauthorized tax exaction where the taxpayer is able to show that it has absorbed the tax. In the instant case the taxpayer alleged in its refund complaint that it did not include the additional tax of $3,121.72 in the sales price of the articles sold by it to the Campana Sales Company and that it did not collect this amount from the Sales Company. The evidence adduced on this point consisted of documentary material (i. e., invoices, tax returns and accounting records) and oral testimony.

The District Court found that the evidence established taxpayer's allegation in this regard.

In July of 1933 Campana Corporation sold its products to Campana Sales Company, the total sales price amounting to $14,652.70. . The Sales Company paid that amount plus $1,465.27 as tax. The Campana Corporation filed its excise tax return showing $14,652.70 as sales, and paid the Collector $1,465.27 as tax thereon. In this month the Sales Company sold these products to wholesalers at a total sales price of $50,456.89. Later on the Commissioner assessed the additional tax of $3,121.72 and the taxpayer paid under protest. That is, the Commissioner measured the tax by the total sales price of $50,-456.89 and assessed the tax at $4,586.99. The difference between this amount ($4,-586.99) and the original tax amount returned by the taxpayer ($1,465.27) is the amount in controversy. Taxpayer admits that it passed on the original tax ($1,465.-27) but contends that it did not pass on the additional tax ($3,121.72), the tax herein in issue.

The invoices disclose that prior to June 21, 1932 (date of the taxing statute), the Campana Corporation sold its $1 item to wholesalers at $8 per dozen.[2] After June 21, 1932, it sold this item at $8.80 per dozen, the invoice indicating that $8 represented the selling price and 80¢ represented the tax. At this time it is undisputed that the manufacturer passed on the tax burden to the wholesalers. On and after July 1, 1933, the Campana Corporation sold its $1 item to the Campana Sales Company at $1.45 per dozen, the invoice indicating that $1.32 represented the selling price and 13¢ represented the tax. The Campana Sales Company then sold this item to wholesalers at $8.80 per dozen, the invoice indicating that $8.80 represented the selling price.

Taxpayer admits that it passed on the original tax burden of 13¢ and that in

---

[2] The $1 size of Italian Balm lotion is taken as illustrative here. The dime size is an exception in a certain respect. Thus prior to June 21, 1932 Campana Corporation sold the dime item to wholesalers at 72¢ per dozen. After June 21 it was sold to wholesalers at 70¢ per dozen, the invoice indicating that the selling price represented 63¢ and the tax represented 7¢. After July 1, 1933 Campana Corporation sold at 30¢ per dozen, the invoice showing 28¢ per dozen plus the tax.

And thereafter the Sales Company sold this item to wholesalers at 70¢ per dozen, the invoice indicating that the selling price represented 70¢.

Thus it appears that the total amount charged including the tax after June 21, 1932 was less than the total amount charged prior to June 21. The evidence also indicates that the dime size accounted for around 67% of the total sales in the tax month in controversy.

turn the Sales Company passed this on to the wholesalers. Without this admission it would be impossible to obtain from the July, 1933, invoices that any tax at all was passed on to the wholesalers. The accounting records disclose plainly that in this regard the Campana Corporation's sales price (which expressly included the 13¢ as tax) was Campana Sales Company's cost of goods sold. The July, 1933, invoices only represented that the $8.80 figure represented the selling price, but as a matter of fact the accounting records and taxpayer's admission show that the original tax (or 13¢ in this instance) was collected from the wholesalers.[3] Nor could the invoices have represented that the $8.80 figure represented an 80¢ or 67¢ tax, for the additional tax (67¢ in this instance) was not assessed until two years later and hence could not have been collected before that time.

Yet counsel for the Collector contends that the taxpayer in fact passed on the additional tax burden (i. e., 67¢ or 80¢ minus 13¢). His argument is based on the invoice evidence related above: he points to the fact that the price which the wholesalers paid before and after July 1, 1933, remained the same (i. e., $8.80); he states that "the statute obviously contemplates that the taxpayer will collect the tax from its vendees and it had been so collecting the tax prior to July 1, 1933"; that he submits that "the natural and logical inference" which would be drawn by the wholesalers upon looking at the July, 1933, invoices "would be that 10 per cent of the price still represented tax."

It is certain that this invoice evidence does not establish that the tax was collected from the wholesalers, nor does it refute the oral testimony and accounting records adduced by the taxpayer to the effect that the additional tax was never collected. The most that can be said about the invoice evidence is that it permits conflicting inferences such as the following: (1) The $8.80 invoice figure still represented 80¢ tax, although the tax was no longer designated thereon; (2) the $8.80 figure still represented the selling price only; and (3) the $8.80 figure still represented tax but in a different amount. Inference (1), described as the "natural and logical in-

---

[3] For the year beginning July 1, 1933 Campana Corporation sold its products to Campana Sales Company in the amount of $427,920.58. This figure represented the selling price plus the excise tax. For instance, to take the $1 item example, the selling price per dozen was $1.32, the tax 13¢, or a total of $1.45. This total charge for the articles constituted Campana Sales Company's cost of goods sold. When Campana Sales Company sold to wholesalers, this original tax was part of the cost of the product and necessarily was reflected in the sales price to the wholesalers. Thus, indirectly the original tax was passed on to the wholesalers.

The accounting records disclosed more data. For instance, a selling price usually reflects cost of goods sold, cost of sales and profit. The table below—for the year beginning July 1, 1933—shows what each element bears to sales:

| Elements | Campana Corporation | Sales Company |
|---|---|---|
| Cost of goods sold | 70% | 33% |
| Cost of sales | 7% | 51% |
| Profit | 23% | 16% |
| Sales | 100% | 100% |

Using the accounting data available and taking the average figures for the three years prior to June 30, 1933, a similar table would show the following relation:

| Elements | Campana Corporation | |
|---|---|---|
| Cost of goods sold | $192,000 | 32% |
| Cost of sales | 340,000 | 57% |
| Profit | 64,000 | 11% |
| Sales | $596,000 | 100% |

The figures in this table are approximate only.

During the four years after July, 1933 raw material costs increased as much as 100%. This increased the sales price to the Sales Company about 50%. Naturally this increased the Sales Company's cost of goods sold, the dollar increase in this regard being around $369,000. Because of competition and because the wholesale trade has become acquainted with fixed prices, the Sales Company was compelled to absorb these increased costs; that is, the price to the wholesaler nevertheless remained the same. The oral testimony also indicates that the Sales Company often was compelled to meet competition by extending cash and extra goods concessions to its purchasers. These concessions amounted to around $35,000 in 1933-1934, $58,000 in 1934-1935 and $100,000 in 1935-1936. These concessions in reality were reductions in the sales corporation's sales price. In any event these items were absorbed; the price to the wholesale trade remained a fixed and constant charge.

ference" by counsel for the Collector, disappears completely in view of the evidence in this case; inference (2) at least is supported by an express representation that the $8.80 figure designates the selling price of the article; and inference (3) is consistent with and supported by the other evidence in the case.

If the taxpayer here had collected an 80¢ tax from the Sales Company and then the Sales Company had represented to the wholesalers that the $8.80 price included an 80¢ tax, then taxpayer would not be heard denying that a portion of the price represented 80¢ tax. But the truth of the matter is that the additional tax (i. e., 67¢ in this instance) was neither assessed until two years later nor then collected by the taxpayer from the Sales Company or the wholesalers. To this effect is the oral testimony which the District Court believed, and the accounting records which we believe. Nor is the invoice evidence adduced by the Collector inconsistent with the evidence showing that the taxpayer did not include the additional tax in its sales price and did not collect the amount of this tax from the Sales Company or the wholesalers.

Counsel for the Collector also relies on certain testimony by Oswalt as supporting the proposition that the additional tax was included in the sales price. A fair summary of this witness's testimony would be that the original tax was included in the sales price but that the additional tax was excluded therefrom. We conclude therefore that there is evidence showing that neither the taxpayer nor the Sales Company passed on the additional tax of $3,-121.72. The District Court's finding in this regard is supported by the evidence and the finding in turn gives support to the judgment thereon.

*Arm's Length.* The District Court stated that: "I am impressed and believe that they (the two corporations) are separate and distinct entities, both in law and in fact. * * * I am convinced that they dealt at arm's length." Plainly the record reveals these two corporations as distinct operating entities, vitalized with business energy and purpose, and they are so recognized by the income tax statute as such. See Sec. 141(d), Revenue Act of 1932, 47 Stat. 169, 213, 26 U.S.C.A.Int.Rev.Acts, page 533; See also S.T. 617, C.B. XI-2, p. 513, Commissioner's Ruling, July-December, 1932. However, it does not follow from this that the inter-company sales are at arm's length.

A sale at arm's length connotes a sale between parties with adverse economic interests. To determine whether a sale between two corporations is at arm's length, it is necessary to look at the stockholders behind the corporate structures. This the District Court did, this counsel for taxpayer in effect concedes, and this our case-law permits. The Supreme Court has been known to disregard an established corporate entity, Southern Pacific Co. v. Lowe, 247 U.S. 330, 337, 38 S.Ct. 540, 62 L.Ed. 1142; Gulf Oil Corp. v. Lewellyn, 248 U.S. 71, 72, 39 S.Ct. 35, 63 L.Ed. 133, and recent judicial expression severely condemns possible circumventions of tax laws by undue adherence to corporate form, Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406. In the last case cited, at page 476 of 308 U.S., at page 357 of 60 S.Ct., 84 L.Ed. 406, the Court emphasized that "transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration."

Our situation comes down to this: the same five persons own the stock in the two corporations. In substance the transaction involved here is a sale by these five persons to themselves. To us such a sale is not at arm's length. Counsel for the taxpayer argues that the "economic benefits obviously do not flow in equal proportions" unless "husband and wife * * * are considered as a unit." We do not find it necessary to quarrel with counsel's point, for it is enough that the same interests are represented by the corporations, that all of the economic benefits flow to the same five persons, and that the corporate control is in their hands. We conclude that the District Court's finding and conclusion thereon to the effect that the inter-company sale is an "arm's length transaction," is not supported by the evidence. Counsel for taxpayer also points to Section 3 of the Revenue Act of 1939, amending Section 619 of the Revenue Act of 1932, 26 U.S.C.A.Int.Rev.Code § 3441 as laying down a reasonable standard for determining whether a transaction is at arm's length. 53 Stat. 862, 863, 26 U.S.C.A.Int.Rev.Code § 3401; Vol. 84, Congressional Record, p. 7802. Assuming that the 1939 standard were applicable in the instant case, our

position would remain the same. We do not think that the 1939 standard and our conclusion here are inconsistent at all.

*Tax Basis.* At first the manufacturing corporation sold to wholesalers at a price of 5 cents and paid the tax based on that price. This sale was one between strangers. After the incorporation it sold to the selling corporation at a price of 2 cents and paid the tax on the basis of 2 cents. Since the same interests controlled the two corporations, this transaction was as if one person sold to himself. In turn the transferee corporation sold to the wholesalers at a price of 5 cents. This sale was one between strangers. Under these circumstances the Commissioner decided that the tax should be measured by the wholesale price of 5 cents.

■ The statute imposes the tax on the *price for which an article is sold,* and the tax attaches to the sale by the manufacturer. Sec. 603 of the Revenue Act of 1932; Williams v. Harrison, 7 Cir., 110 F.2d 989; Indian Motocycle v. United States, 283 U.S. 570, 574, 51 S.Ct. 601, 75 L.Ed. 1277. Generally this tax is measured by the manufacturer's actual sales price at the factory or place of production. See House Report No. 708, Ways and Means Committee; Senate Report No. 665, Finance Committee; Vol. 75, Congressional Record. pp. 5693, et seq. and pp. 11286 et seq. However, if an article is sold at retail, on consignment, or in a transaction otherwise than at arm's length and *at less than the fair market price,* then the tax is computed on the *price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof.* The above italicized words are the exact words of the taxing statute. In the instant case the articles were sold in transactions otherwise than at arm's length, and our immediate problem is to determine the proper basis of the tax.

We believe that taxpayer's business experience preceding the incorporation of the Campana Sales Company, had established the *fair market price* for Campana's Italian Balm. In July of 1933 no change had occurred to vary market conditions. The record indicates that the price of Italian Balm to the trade and to the public remained the same. The only change had been the creation of the selling corporation to which the taxpayer was willing to sell at lower prices than it had been obtaining from wholesalers. Nor was this special price available to wholesalers. In our opinion taxpayer's evidence to the effect that the manufacturer's price to its exclusive distributor was a fair price and one that represented reasonable profits, is not sufficient to establish that the price received was the *fair market price* or the price for which an article is sold in the ordinary course of trade.

Obviously the purpose of the persons in control here was to place Italian Balm before the buying public and the first step in this direction was a sale to the wholesale trade. The incorporation of the selling corporation did not change this purpose. The incorporation merely provided a controlled medium through which sales to wholesalers could be facilitated. It is true that title to the goods passed to the selling corporation but the fact remains that the *same interests retained the control.* Thus prior to incorporation the sale by the manufacturer was directly to the wholesaler at a price of 5 cents; after the incorporation the sale by the manufacturer was made indirectly to the wholesaler at the same price. Under recent tax decisions "transactions, which do not vary control or change the flow of economic benefits" may be ignored by the Commissioner. Higgins v. Smith, 308 U.S. 473, 476, 60 S.Ct. 355, 357, 84 L.Ed. 406.

■ Moreover, the legislative history of the taxing statute adds support to the Commissioner's position in measuring the tax by the wholesale price. It appears that where as in our case the immediate sale from the manufacturer is not at arm's length and there is in evidence the wholesale price, the legislators intended the wholesale price to be the basis of the tax. We relate the legislative history.

The Manufacturers' Excise Tax Statute is really Title IV of the Revenue Act of 1932. 47 Stat. 169, 259-270. As first proposed the statute was in the form of a general manufacturer's excise tax with a low rate on wholesale prices. Vol. 75, Congressional Record, p. 12013. As finally enacted it was in the form of a manufacturers' excise tax on various enumerated articles such as cosmetics or toilet preparations (Sec. 603 of the Revenue Act of 1932, 26 U.S.C.A.Int.Rev. Acts, page 608), furs, jewelry, matches, candy, chewing gum and electrical energy. In the Congress these taxes were included in the Revenue Act of 1932 as a temporary emergency measure to increase the revenue.

In 1938 some of these excise taxes were eliminated, e. g., toilet soaps and furs, but the tax on toilet preparations and cosmetics was retained. Vol. 83, Congressional Record, p. 3202.

When the manufacturers' excise tax bill was reported out of the Committee on Ways and Means, it was explained to the many Representatives on the floor of the House. Mr. Crisp, acting Chairman of the Committee, emphasized that the tax was a manufacturer's tax levied not on the retail price but on the manufacturer's wholesale price. That the manufacturer's price to the wholesalers was to be the starting point of tax computation, appeared again and again in the explanation of the bill. See Vol. 75, Congressional Record, pp. 5693, 5694, 5789 and 5904. The Senate was told the same thing by its Committee on Finance. "The manufacturer's excise tax proposal is to levy the tax once, upon the article in its finished state, but at its wholesale selling price, not at the retail price." Senate Report #665; Vol. 75, Congressional Record, pp. 10085, 11361, 11657.

However, the legislators realized that not all manufactured articles passed through the hands of the wholesalers before reaching the consuming public. In these situations the legislators intended the tax basis to be the wholesale price if that price could be established. Nor did they intend the tax basis to include costs other than the normal manufacturing costs. For instance, to the question—"Does the manufacturer's price that is contemplated include salesmen's commissions?"—Mr. Crisp answered that the "selling cost is not intended to be added." Vol. 75, Congressional Record, p. 5693. On this point House Report #708 and Senate Report #665 plainly indicate that from the tax basis was to be excluded any charge having no connection whatever with the manufacturing process.

From the legislative history above related, it appears that (1) a manufacturer's tax was intended, (2) a price which would reflect normal manufacturing costs was to be the basis of the tax, and (3) the wholesale price adjusted if necessary to exclude non-manufacturing costs, ordinarily would be such a price. In this light the meaning of the statute becomes plain indeed. Sec. 603 imposes upon cosmetics and toilet preparations "sold by the manufacturer * * * a tax equivalent to 10 per centum of the price for which so sold." Sec. 619 (b), 26 U.S.C.A.Int.Rev.Code § 3441(b), provided that if an article is sold at retail, on consignment, or at less than the fair market price and otherwise than through an arm's length transaction, then the tax "shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof * * *." And Sec. 619(a) provides that in "determining * * the price for which an article is sold, there shall be included any charge * * * incident to placing the article in condition packed ready for shipment * * *. A transportation, delivery, insurance, installation, or other charge (not required by the foregoing sentence to be included) shall be excluded from the price * * *."

In interpreting Sec. 619(a) of the statute the Treasury Department stated that "charges which have no connection with the manufacturing process * * * are to be excluded in computing the tax." Article 12 of Regulation 46, promulgated under the Revenue Act of 1932. In this connection it is to be noted that in 1939 Congress deleted the second sentence of Section 619(a) and substituted the following: "Whether sold at arm's length or not, a transportation, delivery, insurance, or other charge, and the wholesaler's salesmen's commissions and costs and expenses of advertising and selling (not required by the foregoing sentence to be included), shall be excluded from the price * * *." 53 Stat. 862, 863, 26 U.S. C.A.Int.Rev.Code § 3401. No legislative comment or explanation was given for the 1939 change.

It follows from what has been said that the taxpayer has failed to comply with the statute and that the Commissioner was justified under the circumstances in computing the tax on the wholesale price. We conclude therefore that the District Court erred in holding that the inter-company price represented the tax basis: its findings in this respect do not support the conclusion rendered thereon.

*Selling and advertising costs.* One more subject remains to be discussed. The selling and advertising expenses of the selling corporation—which pertain exclusively to the nation-wide process of marketing and distributing the taxable product—are not manufacturing costs. The evidence is that the selling corporation sells to

wholesalers by promising that it will "sell what the wholesaler buys," and that the selling corporation does this very thing, in effect selling the taxable article three times over. In this regard the taxpayer's complaint alleges that the "Commissioner erred in failing to reduce the price at which Campana Sales Company sold said articles by advertising and selling costs and expenses paid or incurred by said Campana Sales Company during July, 1933, in determining the price of articles subject to tax under the provisions of Section 603 of the Revenue Act of 1932."

At the trial the taxpayer adduced evidence which showed, and the District Court so found, that the selling and advertising costs of the Campana Sales Company amounted to $29,792.05 for July of 1933. In our discussion of the statute we stated that non-manufacturing charges were to be excluded in computing the tax. Further discussion would not add more than what was said there: the statute directs the exclusion of the selling and advertising costs (of the character here shown) from the tax basis. It is only necessary to conclude, and we so hold, that although the Commissioner had the power under the circumstances of this case to compute the tax on the established wholesale price, he erred in failing to exclude the above described selling and advertising costs from the basis employed.

Other courts have spoken on situations similar to the one at bar. Bourjois, Inc. v. McGowan, D.C., 12 F.Supp. 787; Id., 2 Cir., 85 F.2d 510, certiorari denied, 300 U.S. 682, 57 S.Ct. 753, 81 L.Ed. 885; Inecto, Inc. v. Higgins, D.C., 21 F.Supp. 418; Concentrate Mfg. Corp. v. Higgins, 2 Cir., 90 F.2d 439, certiorari denied, 302 U.S. 714, 58 S.Ct. 33, 82 L.Ed. 551; Luzier's, Inc. v. Nee, D.C., 24 F.Supp. 608; Id., 8 Cir., 106 F.2d 130 and Albrecht & Son v. Landy, D.C., 27 F.Supp. 65. In the other cases the taxpayer did not prevail. In the instant case the taxpayer does prevail as to two points. We do not believe that our decision conflicts with the decisions in the other cases. But if a conflict does exist, we are not disposed to follow the other courts.

The pleadings in this case raised four points: (1) Tax incidence; (2) arm's length transaction; (3) tax basis; and (4) selling and advertising expenses. As to (1), (2) and (3) the District Court made findings of fact and rendered conclusions thereon. As to (4) the District Court made a finding of fact but did not render a conclusion thereon. The conclusion as to (1) is affirmed; the conclusions as to (2) and (3) are reversed. The finding as to (4) is supported by substantial evidence, and the District Court should render the appropriate conclusion thereon. This case is reversed and remanded with directions to proceed in accordance with this opinion.

MAJOR, Circuit Judge (dissenting).

Without entering into an extensive discussion, I shall briefly point out what I regard as the fallacy of the conclusion reached by the court on what appears to me as the fundamental and controlling question.

The District Court specifically found that the price at which plaintiff sold its product and which it contends was the proper tax basis "was not less than the fair market prices of the said product manufactured and sold by plaintiff during the month of July, 1933; and said sales prices included all elements of value of plaintiff's product and trade name both tangible and intangible." The record furnishes not only substantial but well near conclusive support to this finding. By the well established law, we are bound thereby. The opinion seeks to escape the effect of this finding by reasoning that such finding amounts to a legal conclusion. To me such reasoning is not tenable. As a result the conclusion is reached that the tax basis was the wholesale price received, not by plaintiff, but by the selling corporation, recognized as a separate corporate entity, and without any contention that it was plaintiff's agent, thereby establishing a basis vastly higher than the price received, found to be the fair market price.

The Revenue Act of 1932, Section 603, Title 26 U.S.C.A.Int.Rev.Acts, page 608, provides for a tax equivalent to ten per centum of the price for which the taxable article is sold. Section 619 provides two modes of establishing the tax basis, (a) and (b). By (a) the basis is determined by including and excluding certain designated items which necessarily refer to "the price of which the taxable article is sold." (b) becomes material if the article is sold under any one of three conditions: (1) sold at retail, (2) sold on consignment, or (3) sold (otherwise than through an arm's length transaction) at less than the fair

market price. Concededly (1) and (2) have no application. (3) is material if the article is sold at less than the fair market price in the ordinary course of trade. Predicated upon the finding of the court that the taxable articles were sold at a price "not less than the fair market price" it appears that this provision has no application.

In my opinion, the tax basis is the price at which plaintiff sold its product to the sales corporation, including and excluding such items as are designated in 619(a). If this view is correct, the only portion of 619(b) pertinent to the instant case is that found in the last clause which reads: "The tax under this title shall * * * be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers * * *." It would seem this language is applicable to this and the numerous preceding sections imposing a manufacturers' tax. In this connection, it is pertinent to point out that the District Court, in addition to finding that plaintiff's products were sold at their fair market price, found that they were "sold in the ordinary course of trade." The opinion recognizes "that selling to an exclusive distributor was the common mode of business operation."

Assuming, however, that 619(b) (3) is applicable, plaintiff was entitled to recover upon establishing either, not both, of two conditions, (1) that its sales to Campana Sales Company were at not less than the fair market price or (2) that the sales were made through arm's-length transactions.[1] In other words, condition (2) is immaterial if (1) is established, and vice-versa.

The opinion, as I understand, holds that the wholesale price of the sales company constitutes the tax basis for the plaintiff, notwithstanding that the price received by the former was a fair market price. To me, this is a strained and unreasonable construction of the statute—never intended by Congress—and finds little, if any, support in the legislative history of the enactment. As pointed out in the opinion,

the success of both the plaintiff and the sales company was due largely to the expensive and extensive advertising done by the latter, which reached the total amount of one million dollars per annum. The wholesale selling price made the basis of plaintiff's tax liability includes cost of goods sold 33%, cost of sales 51%, and profit 16%. In other words, more than half of the wholesale price was represented by advertising and other costs incurred by the sales corporation, over which the plaintiff had no supervision, direction or control. As a result the fair market price of plaintiff's product remained the same notwithstanding it had relieved itself of sales costs which amounted to more than it actually received for its product. The situation in this respect alone is convincing that such a basis for determining the selling price of plaintiff's product is unreasonable, if not arbitrary.

The opinion discusses at length the phrase "otherwise than through an arm's length transaction," and concludes it was other than such a transaction. I do not take issue with this conclusion, although I regard it as a debatable question. As I have endeavored to point out, however, the solution of the question is not decisive —in fact, it is immaterial in view of the premise which I accept that the products were not sold at "less than the fair market price."

It must not be overlooked that the plaintiff is not charged with formulating a scheme or device with the purpose of evading taxation. Cases such as Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319, and Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406, have no application. On the contrary, the record leaves little, if any, room for doubt that the sale of plaintiff's product to the sales corporation was bona fide and that the course of conduct was dictated and perhaps compelled by economic necessity without any taint of fraud or deception.

Without discussing the matter further, it is my conviction that the judgment of the District Court should be affirmed.

---

[1] This contemplates, of course, that the plaintiff has not passed on the additional tax or collected the amount thereof from its vendees. I agree with the opinion that plaintiff has met this requirement and, therefore, omit it from my discussion.