## INECTO, Inc., v. HIGGINS.

District Court, S. D. New York.
Nov. 17, 1937.

Burke & Burke, of New York City (John Wallace Young and Frederick F. Rehberger, both of New York City, of counsel), for plaintiff.

Lamar Hardy, U. S. Atty., of New York City (Irvin C. Rutter, Asst. U. S. Atty., of New York City, of counsel), for defendant.

GODDARD, District Judge.

Inecto, Inc., the plaintiff, has brought this action to recover manufacturer's excise taxes of $2,923.06 for March, 1933, and $4,166.67 for August, 1933, paid under protest. The plaintiff is a manufacturer of toilet preparations, hair dyes, and miscellaneous cosmetics, and the tax was imposed upon certain of their articles under section 603 of the Revenue Act of 1932, 26 U.S. C.A. § 1420 et seq. note.

On April 18, 1930, Andrevan, Inc., was incorporated in New York and soon after acquired the stock of three existing corporations—Sales Affiliates, Inc., of New York, Inecto, Inc., and the Marinello Company, both of Delaware. Prior to this, Inecto, Inc., of Delaware had been the owner of all the stock of the Marinello Company.

The Revenue Act of 1932 became effective June 21, 1932, 47 Stat. 173. In October and December, 1932, respectively, Inecto, Inc., the plaintiff, and the Marinello Corporation were organized as wholly owned subsidiaries of Andrevan, Inc., and they succeeded to the business of the two Delaware corporations of like names.

Before December 1, 1932, Inecto, Inc., of Delaware, the predecessor of the plaintiff and of the Marinello Company, had sold its output directly to the wholesale trade. Beginning on January 10, 1930, this was done through Sales Affiliates, Inc., which acted as its sole and exclusive agent. The arrangement provided that Sales Affiliates, Inc., was to be paid a commission of 40 per cent. of net sales, and that Sales Affiliates, Inc., was to bear the expense of selling, advertising, and promoting. Under this arrangement it was also provided that orders were to be shipped directly to the purchasers by Inecto, Inc., and the Marinello Company, respectively. The invoices were rendered by them, payments were made to them, and they assumed all credit risks. Sales Affiliates, Inc., secured the orders, attended to the advertising, mail order business, etc. Marinello's arrangement with Sales Affiliates, Inc., was similar. Prior to July 1, 1929, Inecto, Inc., of Delaware, had marketed its products through Harold F. Ritchie & Co., as sales agent, paying it 10½ per cent. of the net sales, advertising, display demonstration, billing and shipping expenses being borne by Inecto, Inc. On May 31, 1929, the Ritchie arrangement was ended, and from then on until the contract with Sales Affiliates was entered into on December 1, 1932, the plaintiff sold to the trade through its own sales force. In December, 1932, a new method of operation was adopted. The newly organized New York corporations, Inecto, Inc., and Marinello Company sold their entire output to Sales Affiliates, Inc., at prices considerably lower than they had been themselves selling it to the trade, and Sales Affiliates, Inc., continued to sell to the trade at the old price. Inecto, Inc., and Marinello Company shipped direct to the purchasers in the trade, billed the sales to such purchasers, and assumed the credit risks; the selling company bore the expenses of selling and advertising. In December, 1932, joint notices of the changed method of operation were issued to the trade by Inecto, Inc. (hereafter when "Inecto" is used, it refers to Inecto, Inc., of New York), and Sales Affiliates,, Inc. This method continued until June 1, 1933, when Inecto acquired all the manufacturing equipment and business of Marinello, and Marinello acquired all the packaging business of Inecto. Thereafter, Inecto manufactured all the products formerly made by Marinello as well as its own products. Inecto's products were sold at various bulk prices; its chief product, "Notox," a hair dye, was sold at $15 a gallon. Marinello's products were sold at cost plus 10 per cent. Marinello became a bottling and packaging company only, putting up the bulk products in the same form in which they had been sold to the trade previously, receiving compensation for this from Sales Affiliates, Inc., based upon the cost of packaging and a service charge. Sales Affiliates, Inc., then sold the products to the same trade and at the same prices as in the preceding periods.

From the above it appears that there were three periods during which different methods were used. Before December, 1932, plaintiff and Marinello sold directly to the trade, paying Sales Affiliates, Inc.,

40 per cent. of the net sales for acting as exclusive sales agent, carrying on the advertising and promoting sales. From December, 1932, to June, 1933, its packaged products were sold to Sales Affiliates, Inc., at prices considerably less than to the trade, and Sales Affiliates, Inc., sold to the trade at the old trade prices. Beginning June, 1933, Inecto became the manufacturer of both its own and Marinello's products and sold to Sales Affiliates, Inc., in bulk at new bulk prices, and Marinello packaged all of the products, Sales Affiliates, Inc., selling the packaged goods to the trade at the old trade prices.

For the purpose of avoiding details and yet presenting the general principles involved, only the various prices at which the hair dye was sold will be considered, as that article constituted 90 per cent. to 95 per cent. of plaintiff's business.

During the first period of operations, when products were sold directly to the trade, the principal form in which the dye was sold was a case designated as "Case No. 11." This consisted of four one-half ounce bottles of hair dye and four one-half ounce bottles of an oxidizing agent known as Notoxide. It was sold to the trade at a list price of $3 with an average discount of 23 per cent., or at an average net price of $2.31. The same case was sold to Sales Affiliates during the second period of operation (December, 1932, to May 31, 1933) at 75 cents per case. During this period Sales Affiliates, Inc., resold to the trade, again at an average net price of $2.31 per case. During the third period (commencing June 1, 1933) the hair dye was sold by the plaintiff to Sales Affiliates, Inc., in five-gallon bottles at $15 per gallon.

In the first period, when sales were made to the trade at an average net price of $2.31, the plaintiff had paid excise taxes to the government on the actual price received. During the second period, when the same article was sold to Sales Affiliates, Inc., for 75 cents per case, the excise taxes were paid on a basis of $1.26 per case. This figure of $1.26 was arrived at by the plaintiff on the following basis: Under its contract of January 10, 1930, by which Sales Affiliates, Inc., had acted as their sole sales agent, Inecto had received 60 per cent. of net sales which had averaged $1.39. From this was deducted expenses of 13 cents for shipping, billing, and credit risks. During the third period, when

sales in bulk were made at $15 per gallon, the taxes were paid on this price. For the March period, when Case No. 11 was sold intercompany at 75 cents and a tax paid on a basis of $1.26, the Commissioner taxed on a valuation of $2.32, the average price received by Sales Affiliates, Inc., from the trade. In August, 1933, when the "price" to Sales Affiliates, Inc., was $15 a gallon in bulk, the Commissioner converted it into units containing the same quantity included in Case No. 11 and based the tax on the price at which Sales Affiliates, Inc., sold it to the trade. It appears therefor that on the same quantity of materials the government was paid as tax (calculated at 10 per cent.) during the first period, 23.1 cents; during the second period, 12.6 cents; and during the third period, 2.3 cents. This will indicate the reduction in taxes sought to be effected by the changes in operation. During all three periods the same article was sold to the trade at the same average net price, $2.32.

Section 619 of the Revenue Act of 1932, 26 U.S.C. § 1420 et seq. note, 26 U.S. C.A. § 1420 et seq. note), is as follows:

"(a) In determining, for the purposes of this title, the price for which an article is sold, there shall be included any charge for coverings and containers of whatever nature, and any charge incident to placing the article in condition packed ready for shipment, but there shall be excluded the amount of tax imposed by this title, whether or not stated as a separate charge. A transportation, delivery, insurance, installation, or other charge (not required by the foregoing sentence to be included) shall be excluded from the price only if the amount thereof is established to the satisfaction of the Commissioner, in accordance with the regulations.

"(b) If an article is— * * *

"(3) sold (otherwise than through an arm's-length transaction) at less than the fair market price; the tax under this title shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Commissioner."

Article 15, Regulation 46, under the Revenue Act of 1932, provides as follows: "Where, though the existence of special arrangements between a manufacturer and a purchaser (as in the case of intercompany transfers at cost or at a fictitious

price) the price for which articles are sold by the manufacturer does not reflect a fair market price, the sale is regarded as one made 'otherwise than through an arm's length transaction.' In such cases the tax shall be computed upon a fair market price, which, under the Act, the Commissioner is empowered to determine."

It will be seen that in the normal case the tax imposed by section 603, 26 U.S.C. A. § 1420 et seq. note, upon the manufacturer or producer is based upon the price for which the article is sold, including the cost of packaging. Where, however, the article is sold otherwise than at an arm's length transaction and at less than a fair market price, the tax is computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Commissioner.

The Commissioner determined that the sales by the plaintiff to Sales Affiliates, Inc., were not at arm's length. He then determined that the prices for which the articles were sold in the ordinary course of trade by manufacturers or producers thereof were those for which such articles were first sold outside the affiliated group, which were the prices received by Sales Affiliates, Inc. The additional tax was assessed on this basis.

The plaintiff contends that the sales during the second and third periods were made at arm's length and that the intercompany sales were at fair market prices.

■ The first question that arises is whether the intercompany sales were at arm's length. Inecto, Marinello, and Sales Affiliates, Inc., were wholly owned by Andrevan, Inc. All of Andrevan's stock was in turn owned by Neal R. Andrews and Ralph L. Evans, except for a short period when the Andrevan stock was held by a voting trust which was controlled by Andrews and Evans, and who constituted the board of directors of Andrevan, Inc. The stock of both the manufacturing company and the sales company was owned by a third company, Andrevan, Inc., and so far as control is concerned, it makes little difference whether it is effected through ownership of one company by another, or through ownership of both companies by a third. All the companies involved were the instruments and were dominated by the same common interest. Andrews was president and a director of all the companies; Clark was also on the board of directors of all the companies, each of which had three directors, so that Andrews and Clark formed a majority of directors of all the companies. C. E. Chamberlain, controller, had charge of the books and records of all the companies. One staff took care of all the books which were all kept in one office. There was a single merchandising department; also but one shipping department. All purchase orders and acceptances were signed for all the companies by the same person. Prior to December, 1932, products had been sold under the trade-names of "Inecto" and "Marinello" by the respective companies. The trade-names were of great value, but when Sales Affiliates, Inc., began selling both of these products the trade ownership of the trade-names remained with Inecto and Marinello, respectively, and their use by Sales Affiliates, Inc., was apparently without consideration. The trade which Inecto built up was a valuable one. In the United States it was the largest producer and seller of hair dyes. Its gross sales for 1932 amounted to $1,137,671.09; yet in December, 1932, when it began selling its entire output to Sales Affiliates, Inc., which in turn took over Inecto's entire wholesale trade, no consideration appears to have been paid to Inecto by Sales Affiliates, Inc., for it. All the offices of the various companies were located in a building at 33 West Forty-Sixth street owned by the Notox Realty Corporation, another wholly owned subsidiary. Little or no change occurred in the practical handling of operations. Actually the same personnel continued to do the same work. Prior to June 1, 1933, when sales were made in packaged form to Sales Affiliates, Inc., Inecto hair dye was manufactured on the fourth floor, sent to another floor of the premises in large containers, and there packaged. From June 1, 1933, on, this same method of manufacturing and packaging continued, only then the packaging equipment was owned by Marinello and the packaging done by employees on its payroll, but the same persons continued to manufacture and to package, the manufacturing staff of Marinello merely being transferred to Inecto's pay roll and the packaging staff transferred to Marinello's pay roll. The "contract" of January 10, 1930, under which Sales Affiliates, Inc., became the selling agent for Inecto is signed by Andrews as president of Inecto, and by An-

drews, as president of Sales Affiliates, Inc. Many of the other "contracts" were similarly signed. While making these arrangements, notices were sent to the trade that the same interests remained in control and that the products and prices would remain the same. It is clear that the facts amply support the Commissioner's conclusion that the sales in question were made "otherwise than through an arm's length transaction." Therefore, it requires the application of the rule that the tax shall be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof as determined by the Commissioner.

I see no substantial difference in the principles applicable to the period of December, 1932, to June, 1933, when packaged goods were sold to Sales Affiliates, Inc., and the period from June, 1933, on when Inecto became the manufacturer of both its own and Marinello's products, selling them to Sales Affiliates, Inc., in bulk at new bulk prices.

■■■ The plaintiff contends that the bulk prices at which its goods were sold to Sales Affiliates, Inc., represented the fair market price of them "in the ordinary course of trade"; that at this price the ingredients could be bought and prepared plus a fair margin of profit; and that in such state the product would not sell for more in the open market, and this is probably true. But this disregards the fact that as sold under the well-established trade-names of the plaintiff and its affiliates, they had been and continued to be sold to the public at considerably higher prices. Plaintiff's trade-mark upon its preparations enabled it to charge several times the actual cost to it of. the ingredients, preparing them, and a fair profit. This was a monopoly which they capitalized to a great financial advantage. The sales, outside the affiliated group, were for much more than the intercompany prices. None of its products were sold or offered for sale to the public at the prices which Inecto sold to Sales Affiliates, Inc., and apparently the intercompany sales prices were not regarded by themselves as representing the price at which they could be sold "in the ordinary course of trade," for the public could only obtain them by purchasing from Sales Affiliates, Inc., and paying the established trade prices. The record of prices previously obtained by

plaintiff and its predecessors had established the market price for its products. No change took place to indicate that it could not obtain the same prices as before. The only change was the forming of wholly owned subsidiaries to which it sold at lower prices. The situation in this respect did not differ materially from that in Bourjois, Inc. v. McGowan, 2 Cir., 85 F.2d 510, which, it seems to me, is determinative of many of the issues now presented. The plaintiff seeks to distinguish the case at bar from the Bourjois Case. In that case the sales companies were subsidiaries of Bourjois, Inc., and in the case at bar plaintiff and its sale company are merely affiliated. In the case at bar the manufacturing company, packaging company, and the sales company were all owned and controlled by Andrevan, Inc. It is the substance, not the mere form, which prevails. The method of control differs, but the result is essentially the same. The profits of all the affiliated companies ultimately reached the one controlling company, Andrevan, Inc. The price history in the two cases do not differ for the only sales in either case at prices lower than those to the trade, were intercompany sales. Plaintiff also contends that Bourjois, Inc., had previously sold in the advertised field and that plaintiff had not. But up to May 31, 1929, when plaintiff sold through the Ritchie Company, it sold its products to the trade in an advertised field; also under the sales agency contract with Sales Affiliates, Inc., of January 10, 1930, which lasted until December, 1932, plaintiff sold directly to the trade in an advertised field. Both Ritchie and Sales Affiliates, Inc., acted merely as agents for plaintiff or its predecessor and were compensated for their services. During the interval between the termination of its arrangement with the Ritchie Company in May, 1929, and the contract of January 10, 1930, with Sales Affiliates, Inc., the plaintiff sold directly to the trade through its own sales force. Prices to the trade remained the same throughout these periods. Another point made by plaintiff is that the trade-name was not affixed to the goods when the intercompany sales were made; but this seems unimportant as it was plaintiff's mark and name under which the articles were finally sold in the ordinary course of trade.

It is true, as plaintiff says, that the Marinello trade name or mark was not the

property of the plaintiff, but it is also true that the plaintiff manufactured, sold, and dealt with them in the same way that it sold the Inecto products.

■ The entire control and management of these various affiliated companies, together with the regulation of all prices, was vested in "Andrevan, Inc.," a corporation, but actually composed of and owned by the two individuals, Andrews and Evans, and it seems to me that while the plaintiff and Sales Affiliates, Inc., were separate legal entities, they might in fact be treated here as mere incorporated departments of a single organization, and the plaintiff, the manufacturer, be taxed upon the basis of the price at which its selling department sold its product.

The statement of the Circuit Court of Appeals for this circuit in Concentrate Manufacturing Corporation v. Higgins, 2 Cir., 90 F.2d 439, 441, opinion of June 7, 1937, is pertinent, in which the same taxing statute was involved: "The plaintiff is a wholly owned subsidiary of the French company, used by it to manufacture its products in the United States; necessarily no more than a department of its business, as the defendant rightly calls it." See, also, Palmolive Manufacturing Company, Ltd., v. The King, Canada Law Reports 1933, 131, where a Canadian tax was under consideration; Bourjois, Inc. v. McGowan, D.C., 12 F.Supp. 787; Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355.

However, the Circuit Court in the Bourjois Case, where the situation was similar in many respects, upheld the tax there imposed upon the ground that the method followed by the Commissioner was in accord with section 619(b) (3) of the 1932 Act, 26 U.S.C.A. § 1420 et seq. note, and that the Commissioner's determination of the price at which such goods were sold in the ordinary course of trade by the manufacturer was supported by the evidence that the taxpayer previously had been selling them at the same prices upon which the tax was assessed, and that they continued to be sold at the same prices, so that I am confining myself to deciding whether the method which the Commissioner actually used in arriving at his determination was right. What he actually did, after finding that the intercompany sales were not at arm's length and that they were below a fair market price, was to assess a tax on the intercompany sales at the prices sold by Sales Affiliates, Inc., to the trade. In respect to hair dye, for instance, this meant that in March, 1933, when Case No. 11 was sold intercompany for 75 cents and a tax paid on a basis of $1.26, the Commissioner revalued it and taxed it on a basis of $2.-32, the price at which Sales Affiliates, Inc., sold it to the trade, and in August, 1933, when intercompany sales were made at $15 per gallon in bulk, the number of gallons were converted into units containing the same quantity of hair dye included in Case No. 11 and these units taxed on the basis of price charged by Sales Affiliates, Inc., to the trade.

■ To accept the price at which Sales Affiliates, Inc., sold to the trade as the price at which plaintiff's products sold "in the ordinary course of trade" is not opposed to the actual facts. Andrevan wholly owned and controlled the manufacturing, packaging, and selling corporations and dictated the price which the trade must pay and did pay for its products. It received all the profits from the several corporations. If the selling and advertising was done by the manufacturer's own employees or agents, such general expenses would not be deductible under the statute from the taxable sales price, and it may not do indirectly what the statute forbids it to do directly. And it is apparent from the decision of the Circuit Court of Appeals in the Bourjois Case, where the selling and advertising expenses also were paid by the sales company during the period in question, that this does not effect the result—presumably on the ground that such expenses may not, under the statute, be deducted from the selling price for the purpose of taxation.

Although it is true, as counsel for plaintiff points out, that Inecto did not itself receive any of the profits made by Sales Affiliates, Inc., under the circumstances we are not so much concerned with how these controlled companies divided up their profits, for eventually Andrevan, Inc., got them all anyhow, as we are with the price plaintiff's products were sold in the "ordinary course of trade."

■ An important element in determining the fair market price of the products "sold" by Inecto to Sales Affiliates, Inc., is the fact that along with its purchases from Inecto, Sales Affiliates, Inc., was permitted to attach plaintiff's trade-marks to the

packages and to sell them as Inecto's and Marinello's products. This considerably enhanced their market value and is disregarded by plaintiff in its contention that the figure it "sold" its bare product to Sales Affiliates, Inc., should be accepted as the price in ordinary trade. In the Bourjois Case the manufacturer's trademark was on the package when "sold" to its sales company. In the case at bar the manufacturer, in the last period, "sold" in bulk to its sales company and it was packaged with plaintiff's trade mark on the containers and sold to the trade as plaintiff's product. This mere form of procedure does not alter the real situation.

■ It is plain that the intercompany sales were not at arm's length. It is also apparent from the foregoing that they were at less than a fair market price. It follows that the Commissioner should have determined the price for which plaintiff's products were sold in the ordinary course of trade in accordance with section 619(b)(3), and I think that the Commissioner's determination, that the prices at which plaintiff's products were sold in the ordinary course of trade were those received by the selling company, is sustained by the evidence. Bourjois, Inc. v. McGowan, 2 Cir., 85 F.2d 510.

■ Plaintiff further contends that its products "Dysolvol" and "Notoxide" were not taxable under section 603 of the Revenue Act of 1932, 26 U.S.C.A. § 1420 et seq. note. This section imposes the tax upon "Cosmetics, * * * hair oils, pomades, hair dressings, hair restoratives, hair dyes, * * * and any similar substance, article, or preparation, by whatsoever name known or distinguished; any of the above which are used or applied or intended to be used or applied for toilet purposes."

Article 22 of Regulations 46 provides: "Scope of tax.—The tax attaches to the sale by the manufacturer of the articles enumerated in section 603 and similar articles commonly or commercially known as toilet articles, which are used, or applied, or intended to be used or applied, for toilet purposes. Any article advertised or held out to be suitable for toilet purposes, or for any purposes for which the articles enumerated in the Act are customarily used, will be subject to the tax, regardless of the name by which it may be known or distinguished. The tax attaches to the sale by the manufacturer of all preparations which are used or applied or intended to be used or applied for toilet purposes or used in connection with the bath or care of the body, or applied to the clothing as a perfume or to the body as a toilet article. The fact that any particular product, preparation, or substance coming within the scope of the Act may have, or be held out to have, a medicinal, stimulating, remedial, or curative value does not exempt it from the tax, if it is commonly used as an adjunct to the toilet or for toilet purposes. * * *"

Under the statute in question, any article or preparation similar to the hair preparations mentioned and used or intended to be used for toilet preparations is taxable. Dysolvol is a preparation for the hair used to remove hair dyes and also in connection with the preparation of the hair for dyeing. It appears to come within the provisions of the statute and regulations as a hair preparation used for toilet purposes. In a booklet accompanying Case No. 11 hair dye, Dysolvol is referred to several times. After explaining that "Notox" hair dye should not be applied to hair which has become stiff and brittle through use of inferior dyes, it states that "such hair must be softened by administering a series of twelve hot oil treatments, using any good blend of oil (or better still, use Dysolvol, the new dye remover made by the makers of Notox)." It says, also in connection with preparation of the hair for application of Notox hair dye, that "dark brown to light brown hair that has been treated with so-called 'restorers' or compound henna packs should have six to twelve applications of Dysolvol." Further, it states that hair which has become too dark from use of hair dyes "may be lightened by several hot oil treatments with Dysolvol." On the carton in which Dysolvol is sold, appears the following: "Dysolvol is an ideal preparation for lightening the color of hair that has been treated with certain preparations. For preparations such as compound hennas and metal salts which coat the outside of the hair shaft, Dysolvol is especially beneficial. Dysolvol acts by softening the coating chemically and removing it mechanically. * * * Hair that has become badly discolored, or broken from the excessive use of compound hennas, may be treated as described. For such hair an occasional egg shampoo is usually beneficial in connection with Dysolvol treatments * * *. For lightening the color of hair that has been

dyed with these preparations, the method of procedure is the same as that outlined above. Each application of Dysolvol has some effect, but after the third treatment the action may be hastened by the addition of peroxide to the oil (one part of peroxide to three parts of Dysolvol)."

Plaintiff has submitted testimony that Dysolvol is for the most part used by professionals in "beauty shops" and not by the individual at home "because of the unsafe nature for public use." However, this does not change the character of the article nor the use to which it is put. It still remains a preparation to be applied for toilet purposes.

Webster's New International Dictionary defines "toilet" as follows: "Act or process of dressing up, especially, formerly, of dressing the hair."

The plaintiff's "Notoxide" consists of a 5 per cent. solution of processed hydrogen peroxide. "The usual drug store peroxide" is a 3 per cent. solution. The plaintiff, however, buys a solution of 30 per cent., dilutes it to various degrees of strength, adds a sterilizer, and other materials, and sells it under its trade-name. It is sold by plaintiff in two forms. One, an equal quantity of Notoxide, is included in a package of its hair dye; directions for use in a booklet stating that equal quantities of each should be combined in dyeing hair. As so used it is an oxidizer to hasten the dyeing process. Two, in separate bottles without hair dye, with an accompanying booklet stating that it may be used for softening the hair preparatory to dyeing it. The carton in which Notoxide is sold states: "As a hair bleach: Use Notoxide full strength. The bleaching action may be hastened by the addition of pure (not household) ammonia; proportions: ten to fifteen drops to each ounce of Notoxide."

Counsel for plaintiff urges that neither "Dysolvol" nor "Notoxide" are similar chemically to the other articles mentioned in section 603. But the taxability of an article under the acts is not determined by its chemical composition but by the purpose for which it is used or intended to be used. I think "Dysolvol" and "Notoxide" are taxable products under section 603.

The motion for judgment in favor of defendant and dismissing the complaint is granted. Fact findings may be presented upon five days' notice.