**MORGAN STANLEY & CO., Inc., v. SECURITIES EXCHANGE COMMISSION.**

No. 129.

Circuit Court of Appeals, Second Circuit.

Feb. 20, 1942.

CHASE, Circuit Judge, dissenting.

———◆———

John W. Davis, of New York City
(Davis, Polk, Wardwell, Gardiner & Reed,

George A. Brownell, and Amory H. Bradford, all of New York City, on the brief), for petitioner.

Chester T. Lane, Gen. Counsel, and Lawrence S. Lesser, both of Washington, D. C. (Christopher M. Jenks, Robert Blair-Smith, Maurice C. Kaplan, and Nathan L. Halpern, all of Washington, D. C., on the brief), for respondent.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This is a petition for review of an order of the Securities and Exchange Commission declaring petitioner, Morgan Stanley & Co., Inc., to be an affiliate of the Dayton Power & Light Co. for the purpose of denying underwriting fees to petitioner in connection with a refunding operation of Dayton. This order was issued pursuant to Rule U-12F-2 of the Commission under the Public Utility Holding Company Act, 15 U.S.C.A. § 79a et seq. Petitioner urges that the record lacks substantial evidence to support the order, and that the Rule is invalid under the Act. We do not agree with either contention of petitioner.

Before we take up the facts, some reference to the purposes of the Act and the Rule are necessary in order to place the problem in its proper perspective. The general background of the Act is well known. Both the unprecedented and generally unregulated growth of utilities, particularly electric, and the vicissitudes of the depression pointed the way for nationwide action. Because of the importance of holding companies as a means of obtaining credit, considerable attention was given to the financial practices of these companies. Here was found, among other evils, a close tieup between investment banking houses and large holding companies. As the National Power Policy Committee observed in its report to the President, transmitted by him to Congress: "Fundamentally, the holding-company problem always has been, and still is, as much a problem of regulating investment bankers as a problem of regulating the power industry." H. R. Doc. No. 137, 74th Cong., 1st Sess., 6.[1]

■ This evil was one of the many aimed at by the bill. Section 1(b), 15 U.S.C.A. § 79a(b), observes that "the national public interest" is or "may be adversely affected—* * * (2) when subsidiary public-utility companies are subjected to excessive charges for services * * * or enter into transactions in which evils result from an absence of arm's-length bargaining or from restraint of free and independent competition; * * * (5) when in any other respect there is * * * lack of economies in the raising of capital." Many provisions of the Act, from the stringent requirements of registration with the Commission and approval of security transactions by the Commission to the disqualification of officials of banking institutions from serving as officers or directors of holding companies or their subsidiaries, implement the avowed purpose of protecting the public and investors from undue banker influence. In addition, the Commission is given broad rule-making powers for furthering the statutory provisions.

It is one of the Commission's rules which is in issue here. Rule U-12F-2 requires, in effect, that no underwriter's fee can be paid on security issues if the underwriter is in the holding-company system, is an affiliate,[2] or is a person "who the Commission finds stands in such relation to the [issuer], that there is liable to be or to have been an absence of arm's-length bargaining with respect to the transaction."

---

[1] See, also, FTC Summary Report, 70th Cong., 1st Sess., Doc. No. 92, Pt. 72-A, 75-76; Hearings before the TNEC, Pts. 22-24; and see the remarks of Representative Rayburn, an author of the bill, referring to the United Corporation and J. P. Morgan & Co., both involved in this case, 79 Cong.Rec. 10318.

[2] An "affiliate" of a specified company is (a) a person holding 5% of outstanding voting securities; (b) a company, 5% of whose voting securities are held by the specified company; (c) an official or director of the specified company, or of a company under (a); and (d) any person found by the Commission "to stand in such relation to such specified company that there is liable to be such an absence of arm's-length bargaining in transactions between them" as to require his being called an "affiliate" for the purposes of the Act. This is to be considered in conjunction with the definitions of a "subsidiary company," which is (a) any company 10% of whose voting securities are held by a holding company; and (b) any person whose management or policies are subject to a controlling influence as found by the Commission. "Person," of course, is an individual or company. §§ 2(a) (1), (8), (11), 15 U.S.C.A. § 79b(a) (1), (8), (11).

The Rule is not applicable, however, if there is an effort to obtain competitive bids, or if competitive bidding is not practicable and the fees are otherwise reasonable. The purpose of the Rule is obvious. As we noted above, one of the objects of the Act is to reduce the cost of financing by encouraging competition. Such requirements as the Act itself imposes were found of little avail because, for example, even after the elimination of interlocking directorates many banking relations continued unchanged. And since there has always been an unwritten rule that investment bankers do not disturb existing issuer-banker relationships, it was evident that some further step was necessary. See Comment, Competitive Bidding in the Sale of Public Utility Bonds, 50 Yale L. J. 1071-1075; and the TNEC hearings there cited. Rule U-12F-2 was designed to find these subtle relationships and prevent their continuance.

The Rule became effective on March 1, 1939, and several cases soon arose in which it was applied without contest.[3] The present case arose in January, 1940, when the Dayton Power & Light Co. filed its request to issue $25,000,000 in bonds. Representatives of the Commission indicated that they would question petitioner's status as principal underwriter under the Rule. To avoid delay in financing the issue, stipulation was entered into whereby petitioner's underwriting fees were impounded pending a determination of its status. After hearing, the Commission found "that the special relationship between Morgan Stanley and Dayton was such that there was liable to have been such an absence of arm's-length bargaining in the Dayton bond financing of 1940, that it is both necessary and appropriate in the public interest and for the protection of investors and consumers that Morgan Stanley be subject to the obligations, duties and liabilities of an affiliate of Dayton for the purposes of Rule U-12F-2." Matter of Dayton Power & Light Co., Holding Company Act Release No. 2654, Mar. 28, 1941. Subsequently the Commission ordered petitioner's underwriting fees, $100,562.50, paid over to Dayton. Holding Company Act Release No. 2693, Apr. 15, 1941. It is this finding and order which are contested.

■ The Commission's opinion—Matter of Dayton Power & Light Co., supra—is long and comprehensive, and we see no need for covering the same ground so thoroughly. Briefly, four steps are taken to adduce the likelihood of absence of arm's-length bargaining. They concern asserted connections from Dayton Power & Light to Columbia Gas & Electric Corporation, the parent of Dayton, from Columbia to United Corporation, a holding company having a substantial stock interest in Columbia, and from United to Morgan Stanley through the connection of both these latter corporations with the banking house of J. P. Morgan & Co.[4] We consider each of these four relationships separately. First is the relationship between Dayton Power & Light and Columbia Gas & Electric, a conceded relationship because the former is wholly owned by the latter, with interlocking officers and directors. Second is the relationship between Columbia Gas & Electric and United, which owns 19.6% of Columbia's voting stock. Although petitioner argues that the mere fact of Columbia's status as a "subsidiary company" within the definition of § 2(a) (8), 15 U.S.C.A. § 79b(a) (8)—as owning 10% of the stock—is not controlling, we think there is little need to discuss this point. Columbia has never carried through any attempt to have the Commission find that it is within the exceptions of § 2(a) (8); and in the absence of such action by Columbia, the Commission is warranted in relying on the statutory definition of a subsidiary company. Furthermore, the 20% holding of United is the largest block of voting securities; and there is supporting evidence in the record showing various connections between United and Columbia. We are not unaware that much less than a majority of stock is frequently sufficient for purposes of control, and we see no reason to contest the legislative view that 10% may be sufficient.

---

[3] The form of avoiding contest was to limit participation in the issue to 5%, allowed by the Rule, and to forego the management fee as principal underwriter. See Northern States Power Co., 4 S.E.C. 728; Gulf States Utilities Co., 5 S.E.C. 170; West Penn Power Co., 5 S.E.C. 376; Iowa Public Service Co., 5 S.E.C. 1619. In Halsey, Stuart & Co., 5 S.E.C. 865, no relationship was found to exist. Another action involving Morgan Stanley is pending. See Consumers Power Co., 6 S.E.C. 444.

[4] The Morgan bank is now incorporated, but was a partnership until after the close of the Commission's hearings.

The third step is the relationship between United and J. P. Morgan & Co. This is the most difficult to establish, and we shall discuss it more fully below. The final step is the relationship between J. P. Morgan & Co. and Morgan Stanley. The latter was organized in 1935, when several partners and employees of J. P. Morgan & Co. and Drexel & Co., the Philadelphia office of J. P. Morgan & Co., left to form an investment banking house. Prior to 1933, J. P. Morgan & Co. had been both commercial bankers and investment bankers, but after the Banking Act of 1933, 48 Stat. 162, 188, and of 1935, 49 Stat. 684, 707, 12 U.S.C.A. § 377, it was necessary for one activity to be dropped. Investment banking was discontinued, and creation of Morgan Stanley soon followed. Most of the old business of the Morgan house went over to the new company, as anyone would have expected. Whether these facts alone would be sufficient to warrant a conclusion that whatever investment business J. P. Morgan & Co. might be able to influence would be thrown Morgan Stanley's way we need not decide, for the Commission adduced still further facts. It was shown that at the time of organization most of the capital was supplied by other Morgan partners than those who formed the new company. Though not so large as formerly, Morgan partners still hold about 30% of the capital and surplus in the form of approximately 44% of the non-voting preferred stock, 4% cumulative, 6% if earned.[5] From this fact the Commission inferred that J. P. Morgan & Co., through its interested partners, stood to gain financially by getting business for Morgan Stanley. Petitioner claims that even all this is insufficient to support the Commission's conclusion. We admit that there are many facts in this case which require far-reaching inferences to support the conclusions announced. This is hardly one. Tangible proof of a goodly financial stake in successful business relationships should be enough to satisfy the most confirmed doubter that there is likely to be mutual effort expended in obtaining business.

We come, therefore, to what is undoubtedly the most tenuous step in establishing the likelihood of an absence of arm's-length bargaining—the relationship between J. P. Morgan & Co. and United. Here again, we see no need to detail the story so fully as the Commission has done. See Matter of Dayton Power & Light Co., supra, pp. 8-13. We think the following facts substantially state the high lights of the Commission's case. First, United was organized by J. P. Morgan & Co. and Bonbright & Co. in 1929. The two houses held large holdings in several holding companies, and these were exchanged for stock in United, which was soon disposed of. From the beginning Morgan and Bonbright named the directors, who in turn chose the president of United, Howard, who is still president. At least one Morgan partner remained on the board until March 28, 1938, the day the Supreme Court upheld the constitutionality of the Act in Electric Bond & Share Co. v. S. E. C., 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105. The resignation was prompted, of course, by the requirement that United register, and this could hardly be done with a banker on the board of directors. After this director's resignation in 1938, United's president conferred with him on three occasions about what apparently were the more important financial transactions engaged in by United. Petitioner says these were not "conferences," but merely instances of conversations after the fact. This is neither here nor there. In and of themselves the conferences indicate continuing interest. And the fact that the Morgan partner made no "suggestions" may indicate anything from lack of interest to satisfaction that the right thing was done.

But this original dominant influence over United, decreasing through the years, is only one element of the story. After United was organized, some of the pre-existing banking connections of companies put into the United structure were broken and the business sent to J. P. Morgan & Co. This was not, however, true of Columbia, which did not come into United's orbit until a short time after the formation of United. But Columbia's banker was the Guaranty Co., which was on extremely good terms with the Morgan house. In view of the unwritten rule that satisfactory banking arrangements are not disturbed, it seems reasonable for the Commission to have concluded that J. P. Morgan & Co. would not give the friendly Guaranty Co. the short shrift it gave others. Termination of Columbia's relation with Guaranty—resulting in its shift to Morgan Stanley—did, of

---

[5] If we add shares held by a deceased partner and shares held as trustee, the percentages are 55.8% of capital and surplus, and 80% of the preferred stock.

course, become necessary with Guaranty's withdrawal from the investment business when the Banking Act outlawed commercial and investment banking combinations. Furthermore, after the formation of Morgan Stanley, all of the debt security flotations of the units of United, including Columbia Gas & Electric, were, with three minor exceptions,[6] managed by Morgan Stanley. And no security flotation for gas and electric utilities outside the United orbit has been handled by them. This evidence is bulwarked by other evidence tending to show acceptance by the "Street" of the powerful position of Morgan Stanley in this as well as in other former Morgan lines.

Finally, there is the financing operation of Dayton here involved. It appears that of the $25,000,000 floated, only about $5,700,000 was new money. The rest involved refunding of bonds issued in 1935, maturing in 1960. Columbia officials, when they first approached Morgan Stanley, had in mind a flotation of only $5,700,000. The latter convinced them, however, that the additional refunding was desirable. True, there is an extension of maturity—until 1970—and a net saving to Dayton of $48,000 a year for twenty years, or nearly a million dollars.[7] But the present value of this is, of course, less, and set against it is absence of a pressing need for refunding and the loss of investor good will through calling twenty-five-year bonds within five years of issuance. Furthermore, there were the underwriters' fees of about $400,000.[8] Petitioner argues that the public, not Dayton, pays this, which in a sense is true. If, however, the issue could have been placed privately—as would have been likely for an issue covering only the required new money—there would have been no fees; and if there had been competitive bidding, the underwriting spread might have been less. All in all, we think the Commission could reasonably question whether this transaction would have taken place without some sort of prodding.

◼ These, then, are the salient facts, elaborated in the record by various witnesses and from various points of view, by which the Commission sought to adduce a likelihood of an absence of arm's-length bargaining between Morgan Stanley and Dayton. The question for us is only whether or not the evidence is substantial. § 24(a), 15 U.S.C.A. § 79x(a). Petitioner seeks to detract from the evidence by implying that it in no wise supports the view that Morgan Stanley holds a club over Columbia and its subsidiaries, sufficient to force them, actually and legally, perhaps, to do Morgan Stanley's bidding. Obviously this is not the Commission's case; we do not understand the Commission to assert it or that the Rule requires it. The very wording of the Rule contemplates subtle relationships. There need not be an absence of arm's-length bargaining, only a likelihood that there is. "Arm's-length" can hardly be meant in the traditional sense of fiduciary relationships, for the very provisions of the Act require complete dissociation of banker and utility. The type of influence envisaged is not over-all control, but influence in choosing underwriters. In sum, the Rule aims at breaking up underwriting ties which owe their existence to factors other than competitive advantage, in the broadest sense of the word. In this light we think the Commission acted within

[6] The three minor exceptions were issues of the Connecticut Light & Power Co. This is apparently explained by a Connecticut statute, Conn.Gen.Stat., Supp.1935, § 1414c, which indicates a strong preference for local financing untouched by foreign holding companies.

[7] The Commission has not favored us with the method of computing this net saving, nor has petitioner as to the somewhat higher figure it claims. It appears to have been found by computing the gross interest saved, and subtracting from it the annual amortized amounts of the call premium and the refunding expenses, plus the estimated increase in income tax payments owing to the decrease in the amount of the deductible interest item. Since the old bonds were called at 104½, there was, of course, a substantial call premium. See Dayton Power & Light Co., 6 S.E.C. 787. An item of $55,460.40, representing duplicate interest which Dayton had to pay because of different issuing and call dates, is not included in the net saving.

[8] The underwriters' fees on the bonds actually issued—which provided both the required new money and the payment of the issue which was called—resulted from the spread between the net amount paid Dayton at 102¼ and the sale price of the bonds to the public at 104, a total of $437,500. Of this, Morgan Stanley was to receive $100,562.50, which is the sum restored to Dayton by the Commission's order.

its power of finding the facts by all reasonable inferences. N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368; F. W. Woolworth Co. v. N. L. R. B., 2 Cir., 121 F.2d 658; and see Detroit Edison Co. v. S. E. C., 6 Cir., 119 F.2d 730.

■ Furthermore, the Supreme Court has recently observed that some leeway must be given to administrative bodies over and above simple fact finding. "It is not the province of a court to absorb the administrative functions to such an extent that the executive or legislative agencies become mere fact finding bodies deprived of the advantages of prompt and definite action." Gray v. Powell, 62 S.Ct. 326, 333, 86 L.Ed. ——. We do not read this to destroy full review of questions of law, but we do understand it to lessen somewhat the force of petitioner's argument based on Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 491, 57 S.Ct. 569, 81 L.Ed. 755, as giving a court full power to review mixed questions of law and fact. Unless we find no warrant in the Act for the Rule, we are content to give the Commission some leeway in ascertaining what it conceives a likelihood of absence of arm's-length bargaining.

■ We turn, then, to petitioner's attack on the validity of the Rule. Petitioner first argues that the Rule cannot rest alone on § 12(f), because that section deals only with "affiliates," and the Rule covers persons not previously found to be affiliates under § 2(a) (11) (D). The Commission's reply is that the Rule combines §§ 2(a) (11) (D) and 12(f) in that a determination of "affiliate" under the Rule is both a determination of the need for "maintenance of competitive conditions" in security issuing, as covered by § 12(f), and a determination that a given issuer is an "affiliate" under § 2(a) (11) (D), and thus comes under § 12(f). In other words, the Commission presumably sought to avoid the absurd situation of holding hundreds of hearings involving many utilities and banking houses in order to find in advance all possible likelihood of absence of arm's-length bargaining. Surely petitioner would have objected to such waste motion. Instead, the Commission created an ad hoc method of determination, which seems to us an accommodation to underwriters such as petitioner. The argument is made, however, that the Rule does not contemplate a § 2(a) (11) (D) determination. But the Commission notes that it ought to be competent to construe its own rules, within the limits of statutory power. We agree, and shall, therefore, assume that the Rule is in effect a § 2(a) (11) (D) determination.

■ On this assumption, petitioner offers three objections to the validity of the Rule. First, it says that a § 2(a) (11) (D) determination requires notice, opportunity for hearing, and a finding of the status of affiliate, which shall not become effective for thirty days. § 2(b). Petitioner got its notice and hearing, and only the loss of the thirty-day period can be material. But the Commission would have been willing to wait thirty days had Dayton consented to hold up the bond issue. In fact, it was at petitioner's urgent request that the issue went through in advance of the determination. Apart from the question whether or not any objection to the thirty-day loss was waived, we feel sure that no attack could have been made on the Commission's insistence in holding up approval of the Dayton issue. And if that is so, this more reasonable and accommodating procedure is hardly invalid.

■ Petitioner's second objection is that one must be an "affiliate" for all purposes or for none at all, whereas the Rule limits a finding to the transaction in issue. It is enough to say that even petitioner admits it would be absurd to call itself an affiliate for all purposes. We cannot say that Congress required the Commission to make an absurd finding; if the lesser achieves the purpose of the Act, that is all the better. Finally, petitioner argues that § 2(a) (11) (D) requires a finding of affiliation to be "necessary or appropriate in the public interest or for the protection of investors or consumers," and that no evidence was introduced on this point. This argument may be answered, first, by noting that petitioner was given full opportunity to introduce any evidence on this point which it had, and second, by observing that the Commission specifically found that its order was in the public interest. We see no reason for the Commission to adduce special evidence on the point. "Maintenance of competitive conditions," as stated in § 12(f), is enough public interest; and if the Commission was justified in finding a likelihood of absence of arm's-length bargaining, interference with "maintenance of competitive conditions" follows as a matter of course.

It remains only to say that the broad rule-making power under § 20(a), 15 U.S.C.A. § 79t(a),[9] justifies the promulgation of the Rule under §§ 12(f) and 2(a) (11) (D). Our discussion above of the history of the Act and the reasons for the provisions relating to investment bankers amply demonstrates the Congressional purpose in this regard. Any ambiguity or debatable language in the substantive provisions should be resolved in favor of the Commission, which is best able to determine the most efficient ways of implementing the broad purpose of the Act. See United States v. American Trucking Ass'ns, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Gray v. Powell, supra; Hamilton and Braden, The Special Competence of the Supreme Court, 50 Yale L. J. 1319, 1364-1367.

Petitioner would apparently draw some conclusion of weakness in the Commission's position from the fact that it withdrew Rule U-12F-2 shortly after this order was entered. Since, however, the Commission did so because it found the old rule not stringent enough and substituted a new rule making competitive bidding mandatory (with very limited exceptions), Holding Company Act Release No. 2676, Apr. 8, 1941,[10] we cannot see how any inferences favorable to the petitioner can be drawn from the change.

Order affirmed.

L. HAND, Circuit Judge (concurring).

I agree with what Judge CLARK has said, but I should like to say a few words of my own about the statute. If one translates the language into the particular relation of banker and utility company, the banker becomes an "affiliate," if the Commission finds him to "stand in such relation" to the company "that there is liable to be such an absence of arm's-length bargaining * * * as to make * * * appropriate * * * for the protection of investors" the imposition upon him of "the * * * duties * * * imposed * * * upon affiliates." I read this clause as a whole as imposing upon the Commission the duty of deciding whether there is a danger—immediate enough to make its removal "appropriate" to the protection of investors—that the utility company in its bargaining with the banker may be actuated in part by motives other than driving the hardest bargain it can. The Commission is not charged with finding that such a motive has in fact entered into the bargaining, or will do so; it is enough that there is a fair chance that it may. I construe "liable" as including more than those cases in which the "absence" is more probable than not; that is, as covering cases in which the probability is enough to be what I have called "a fair chance." Again, I construe "arm's-length bargaining" as going beyond conventional fiduciary relations; indeed, this seems to me obvious, else the definition would have been redundant. Such an interpretation of the clause does indeed sweep along with transactions in which the evil aimed at actually exists, transactions as innocent as this one seems to have been. I see no objection to it on that score; it is a frequent consequence of legislation of this root and branch type. It is notoriously difficult to ascertain just what motives prompt an act—the actor is often the worst witness—and it is legitimate to avoid such a treacherous issue even at the expense of condemning transactions, blameless if the whole truth could be known. Indeed, the whole law of fiduciaries is built upon just the difficulty of learning the truth with the crude means available. It recognizes the fallibility of any conclusion, but considers the evils that will be prevented as outweighing the limitations imposed upon otherwise lawful conduct. The statute at bar merely extends such a precaution beyond those relations which the common-law thought to require it, and clearly we have no warrant for denying the power of Congress to go so far. There had been very grave evils in the marketing of the securities of utility companies, and it was at least a possible remedy to vest power in the Commission to declare when the motives of the utility companies—quite unconsciously perhaps, as

---

9 "The Commission shall have authority from time to time to make, issue, amend, and rescind such rules and regulations and such orders as it may deem necessary or appropriate to carry out the provisions of this chapter."

10 As had been urged by commentators. See 50 Yale L.J. 1071, citing various comments, as well as the objections of investment bankers, which included a monograph by petitioner's president. See, also, Report of Public Utilities Division of the S.E.C., The Problem of Maintaining Arm's-Length Bargaining and Competitive Conditions in the Sale and Distribution of Securities of Registered Public Utility Holding Companies and Their Subsidiaries, Dec. 18, 1940.

in the case of an avowed fiduciary—might not be as untinctured as was "appropriate" to the uncompromising pursuit of their interests.

If the clause be so read, there was "substantial evidence" to support the finding; that is to say evidence from which a reasonable man might conclude that such a chance existed and that the danger was immediate enough to make its removal "appropriate." I do not say that personally I should have come to that conclusion, but there had been enough in the relations between the United Company and the Morgan firm to permit the conclusion that the familiarity, recourse for advice, reliance, control and habitude of the past might perhaps unconsciously prove the casting straw. Congress appears to me to have been jealous of the results of the slow cumulation of such factors and to have wished to endue the Commission with power to decide when it was the course of prudence to eliminate the possibility of its influence. The Supreme Court in decisions of which Gray v. Powell, 62 S.Ct. 326, 86 L.Ed. ——, is the latest, has unequivocally set the narrowest limits upon our review in such situations. The vague outlines of the issue itself, coupled with this circumscription of our powers, leaves us little or no scope.

I have spoken only of the relations between the United Company and the Morgan firm because that is the only doubtful link in the chain. The Dayton Company and the Columbia Company were one in interest; and quite aside from any implications from the statutory definition of "subsidiary", § 2(a) (8), I think we can take judicial notice of the fact that the ownership of twenty per cent of the voting power of a company makes the owner "liable" to have practical control. Whether this action, or other such stringent action, was necessary, is not for me to say. The Commission has apparently found the regulation impracticable in application; and in order to cut out the possibility of influences which it could not detect, it has gone further and stopped all underwriting except upon competitive bidding. Nevertheless, while the regulation stood upon the books, it was valid and it authorized the action taken in this case.

CHASE, Circuit Judge (dissenting).

It is obvious that, by the statutory definition of affiliate in § 2(a) (11) (D) of the Act, 15 U.S.C.A. § 79b(a) (11) (D), as "any person or class of persons that the

Commission determines, after appropriate notice and opportunity for hearing, to stand in such relation to such specified company that there is liable to be such an absence of arm's-length bargaining in transactions between them as to make it necessary or appropriate in the public interest or for the protection of investors or consumers that such person be subject to the obligations, duties, and liabilities imposed in this chapter upon affiliates of a company" Congress has delegated to the Commission very broad and comprehensive power to declare who is, or is not, within the reach of the statute. For present purposes, I shall assume that this delegation of power is as full and complete as it may be and still be within the constitutional limitations upon Congress recognized in Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, and Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446. Even so, there must be some standard of interpretation less vague than the Commission's uncontrolled discretion. Compare Champlin Refining Co. v. Corporation Commission of Oklahoma, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403; A. B. Small Co. v. American Sugar Refining Co., 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589; United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045; International Harvester Co. v. Kentucky, 234 U.S. 216, 34 S.Ct. 853, 58 L.Ed. 1284. What is "liable to be or to have been" is, indeed, an elastic expression which, when applied to the rather uncertain concept of what may be "such an absence of arm's-length bargaining * * * as to make it necessary or appropriate in the public interest" to impose upon one the statutory status of an affiliate, gives the whole a meaning still more elusive. For that very reason it is especially important for a reviewing court to make sure that the Commission's order has substantial evidence to support the findings of fact upon which it is based. Only if there is substantial evidential support for them are they conclusive. 15 U.S.C.A. § 79x(a). And this means support more firm than that afforded by suspicion, conjecture or but a scintilla of evidence. "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. See, also, Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74

L.Ed. 720; National Labor Relations Board v. Columbian Company, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660; Ballston-Stillwater Co. v. National Labor Relations Board, 2 Cir., 98 F.2d 758, 760.

Before discussing the evidence, the Commission's Rule U-12 F-2 should be considered for that was relied on as the justification in law for the order. In so far as now material, its promulgation was an attempt by the Commission to apply the above-mentioned statutory definition of affiliate to any underwriter of any securities in connection with the issue, sale or acquisition of which an application or declaration was required under the Act. This was expressly limited, however, to the purpose of the rule which was to make it possible to deny a fee to any person found to be within its scope. I have little doubt that this rule was within the Commission's rule-making power and that it is valid provided it is not construed so broadly as to make it a substitute for proof. Yet it does, indeed, resemble punitive legislation beyond the limits of the Act. What I would emphasize is that the same sort of substantial evidence is needed to bring any person within the rule as is required to bring one within § 2(a) (11) (D), 15 U.S.C.A. § 79b(a) (11) (D). The rule-making power does not, of course, exceed the power of Congress itself to legislate. And the authority of an administrative board to make rules is always only to make them in accord with the specific power, subject to its limitations, lawfully granted by Congress in the statute. United States v. Chicago, Milwaukee, etc., R. R. Co., 282 U.S. 311, 324, 51 S.Ct. 159, 75 L.Ed. 359.

The pertinent language of the rule is that it shall be applicable to, "Any person who the Commission finds stands in such relation to the declarant, or applicant, or to the person by whom the fee is to be paid, that there is liable to be or to have been an absence of arm's-length bargaining with respect to the transaction." It is perhaps significant that here, in some contrast to what may be called the parent section of the statute, the test, so far as language is concerned, is made solely the liability of an absence of arm's-length bargaining with respect to the transaction. In this particular instance the Commission did reach the conclusion that the public interest was liable to be adversely affected but if it is held, as I think this court is, in effect, holding, to mean in practice that the Commission may apply the rule as it happens to see fit whenever it elects to regard its own conjectures as evidence of fact the rule itself is invalid because it gives the Commission uncontrolled discretion to blow hot or cold as it happens to choose—a power which even Congress could not delegate to it under the Constitution and the authorities above cited.

The assumption of uncontrolled power has in this instance led the Commission to dispense with essential evidence in making its order and to arrive at a result unsupported by the facts under the law. That makes it necessary to review the facts briefly.

The petitioner was organized by the partners of J. P. Morgan & Co., and they continued to have such an interest in its affairs that I agree there is evidence which would support a finding that, for the purpose of Rule U-12 F-2, it and the Morgan firm may fairly be treated as one. That is by no means true, however, in respect to Dayton. There was no intimate relationship by way of stock interest. The Morgan partners had but a negligible, minute stock interest of less than 1/2 of 1% even in United, and United owned only some 19.6% of the voting stock of Columbia Gas & Electric Corporation, of which Dayton was a wholly owned subsidiary. It is true that there had been in the past satisfactory business transactions between the men in what may be called generally the Dayton management and what may be equally generally called the Morgan firm. No doubt there were also personal friendships and it is scarcely to be doubted that what is often called goodwill in business was present. This would naturally lead Dayton to consider consulting the petitioner concerning this financing operation with a view to learning whether it was a feasible one and whether some agreement to have the petitioner undertake it could be reached. That was done and an agreement was made under which the petitioner did do the work both, as is conceded by all, well and at a reasonable cost. The evidence will support no contrary findings which are of fact alone and no such findings were made.

And so far as the present petition is concerned, it is to be taken for granted that the bond issue, in amount and otherwise, was in the public interest. It had been authorized by the Public Utilities Commission of Ohio and it had the approval of the Securities and Exchange Commission to the extent of an order ap-

proving an application for exemption under § 6(b) of the Act, 15 U.S.C.A. § 79f(b). In re The Dayton Power and Light Company, 6 S.E.C. 787. Obviously it was entirely proper for Dayton to sell these bonds and it was reasonable, if not absolutely necessary, for Dayton to engage some underwriter to do that. If not the petitioner, someone else in that business. Consequently, one would naturally look for evidence in support of this order to indicate the likelihood that, if the petitioner did it, the work would not be as well done or would not be as economically done or would in some way not be as beneficial to Dayton and to the public as it would be if done by someone else. This record is barren of any such evidence.

In the absence of proof, worthy of the name, to show that the petitioner had any means by which it could bend Dayton to its will, the Commission at long length, by extremely tenuous and subtle deductions, finally guessed itself into believing that there were subtle relationships which supported its ultimate conclusion that the petitioner should be denied its fee under Rule U-12 F-2. Its opinion as filed discloses, without expressly admitting, that the Commission merely suspected what it concluded in this regard. The only tenable alternative is that it acted on information it had which was not in evidence. If so, the order is palpably erroneous. As Mr. Justice Brandeis said in the Chicago Junction case, 264 U.S. 258, 263, 44 S.Ct. 317, 319, 68 L.Ed. 667, "Facts conceivably known to the Commission, but not put in evidence, will not support an order. Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431." And as the same learned justice also said in the same case " * * * to make an essential finding without supporting evidence is arbitrary action."

The result is that the Commission, having attributed some new, and "subtle" meaning to the phrase "arm's-length bargaining" as·used in its rule, has made a determination of a mixed question of law and fact not binding upon a reviewing court which performs its duty under Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755. A conclusion as to an arm's-length transaction is open to correction. Campana Corporation v. Harrison, 7 Cir., 114 F.2d 400.

That term as used in this rule or in this statute has received no judicial interpretation so far as I am aware and most of the cases dealing with it have been those where some fiduciary or subsidiary relationship was involved. In Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, there was the claim of a director against his bankrupt corporation. American Telephone & Telegraph Co. v. United States, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142, was concerned with the relationship of many subsidiaries and affiliates in the Bell system. In Natural Gas Pipeline Co. v. Slattery, 302 U.S. 300, 58 S.Ct. 199, 82 L.Ed. 276, the court pointed out that where there were common directors and common ownership of a substantial amount of stock of the two transacting companies there need not be control secured through ownership of a majority of the voting stock to constitute absence of arm's-length bargaining. Joint adventurers were involved in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1. And in Webster v. Kelly, 274 Mass. 564, 175 N.E. 69, and Feiber v. Copeland, 232 App.Div. 504, 250 N.Y.S. 429, the relationship was that of attorney and client. E. Albrecht & Sons v. Landy, 8 Cir., 114 F.2d 202; Bourjois, Inc. v. McGowan, D.C., 12 F.Supp. 787, affirmed 2 Cir., 85 F.2d 510, and Inecto v. Higgins, D.C., 21 F.Supp. 418, had to do with the phrase in tax situations respecting transactions between corporations and wholly owned subsidiaries. In Black's Law Dictionary it is stated that, "Parties are said to deal at arm's-length when each stands upon the strict letter of his rights, and conducts the business in a formal manner, without trusting to the other's fairness or integrity, and without being subject to the other's control or overmastering influence." As used in this rule "arm's-length bargaining" should mean bargaining in which the issuer of the security is competent to, and does, freely seek to promote its own best interest with due regard for the public and in accord with fair and honest business methods. Any conclusion that the arrangements for this financing were not so made by the representatives of Dayton, or were liable not to have been so made by them in dealing with the petitioner, goes far beyond any substantial evidence in this record.

I would grant the petition to set aside the order.